Alex Asil Mashiri (SBN 283798)
alexmashiri@yahoo.com
MASHIRI LAW FIRM
A Professional Corporation
11251 Rancho Carmel Drive #500694
San Diego, CA 92150
Tel.: (858) 348-4938
Fax: (858) 348-4939

Alexander H. Schmidt*
alex@alexschmidt.law
ALEXANDER H. SCHMIDT, ESQ.
5 Professional Circle, Ste. 204
Colts Neck, NJ 07722
Tel.: (732) 226-0004
Fax: (732) 845-9078

D. Anthony Mastando*
tony@mastandoartrip.com
Eric J. Artrip*
artrip@mastandoartrip.com
MASTANDO & ARTRIP, LLC
301 Washington St., Suite 302
Huntsville, AL 35801
Tel.: (256) 532-2222

*Attorneys for Plaintiffs and the Proposed Class*

*\*Pro Hac Vice application to be submitted*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BEST CARPET VALUES, INC. and THOMAS D. RUTLEDGE, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GOOGLE LLC,<br><br>Defendant. | Case No:<br><br>**COMPLAINT FOR:**<br><br>1. **IMPLIED-IN-LAW CONTRACT AND UNJUST ENRICHMENT;**<br>2. **TRESSPASS TO CHATTELS; and**<br>3. **UNFAIR AND UNLAWFUL CONDUCT IN VIOLATION OF CAL. BUS. & PROF. CODE § 17200**<br><br><u>**CLASS ACTION**</u><br><br>DEMAND FOR JURY TRIAL |

Plaintiffs Best Carpet Values, Inc. and Thomas D. Rutledge, on behalf of themselves and all others similarly situated, file this Class Action Complaint against Defendant Google LLC ("Google"), and for their causes of action respectfully allege as follows:

## **INTRODUCTION**

1.      Plaintiffs are owners of active U.S.-based websites who have been damaged because Google placed cost-free advertising on their websites without their consent. Plaintiffs bring this action on behalf of themselves and millions of website owners nationwide who were similarly harmed by Google's rampant unauthorized practice of placing cost-free ads on non-Google websites between late March 2018 and April 22, 2020 (the "Class Period").

2.      For those two years, Google abused its dominance in three interrelated markets—the internet search, internet advertising and smartphone operating system markets—to unlawfully obtain over $1 billion of non-consensual free advertising for Google and for Google's advertising network clients on Plaintiffs' and the putative Class's websites. Google also derived substantial unjustly earned revenues from its free-riding ads.

3.      Google obtained these illicit benefits by programing Android mobile phones to impose unpaid-for ads on websites whenever they were viewed by Android owners who used Google's "Search App" to search the internet. To effectuate and maximize the returns from its scheme, Google secretively placed its Search App on every Android phone in a manner that was designed to induce Android owners to use the Search App exclusively or extensively in lieu of web browsers or other means of searching the internet.

4.      Google's unilaterally imposed free-riding ads took two forms: Initially, Google superimposed ads called a "leaderboard" at the bottom of Plaintiffs' and the Class's websites that contained Google's logo and, thus, constituted free ads for Google. Next, the leaderboard invited Search App users to click a pop-up button that, if clicked, expanded the leaderboard to block the affected web pages' entire contents by superimposing half-page ads for Google products, for Google advertising network clients or for other businesses over Plaintiffs' and the Class's web pages. Android users who clicked those half-page ads were redirected from Plaintiffs' and Class

members' websites to the advertised websites, which often had their own ads—placed by Google—that, when clicked or viewed, generated direct fees or commissions for Google.

5. Thus, Google's free-riding leaderboard and half-page ads were designed to induce (or "nudge" in advertising parlance) Android users to leave Plaintiffs' and the Class's sites—which generated no fees for Google—in favor of other websites that could generate income for Google.

6. Many of the half-page pop-up advertisements that Google's Search App imposed on Plaintiffs' and the Class's websites promoted and linked to websites owned by their *direct competitors* or to news articles *disparaging* their businesses. Plaintiffs and Class would not have voluntarily permitted competitors' ads or disparaging ads to appear on their websites. Google's misconduct, however, caused competitors' ads and disparaging ads to appear on Plaintiffs' and the Class's websites against their will (and usually without even their knowledge). By redirecting Android users to Plaintiffs' and the Class's competitors' and detractors' websites, Google's unlawful free-riding ads damaged, or threatened to damage, the Plaintiffs' and Class members' reputations and businesses, leading to lost customers, lost sales and lost goodwill.

7. Plaintiffs bring claims at law for (i) implied-in-law contract seeking restitution for Google's unjust enrichment derived from its non-consensual free advertising, in an amount equal to Google's cost-savings plus its undue profits, and (ii) trespass to chattels, seeking damages for the diminished value of Plaintiffs' websites resulting from Google's obstruction and interference with their websites' presentation and content.

8. Plaintiffs also seek to permanently enjoin Google's unfair and unlawful conduct under both the common law and California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, 17203. Injunctive relief is warranted (i) to prevent Google from inflicting future lost sales and reputational injury upon Plaintiffs and the Class, and (ii) because Google's non-consensual free ads trample on Plaintiffs' and the Class's property rights and First Amendment rights, causing material harm that cannot be fully and fairly compensated by money damages.[1]

---

[1] Google updated its Search App on or about April 22, 2020 to discontinue (at least temporarily) the conduct complained of herein. Google was aware of objections to its conduct and was warned of a potential lawsuit no later than October 2018 yet persisted in misusing its Search App to obtain unlawful free advertising and otherwise harm Plaintiffs and the Class for an additional 18 months.

CLASS ACTION COMPLAINT

**THE PARTIES**

9.     (a) Plaintiff Best Carpet Values, Inc. ("Best Carpet") is a resident of Chatsworth, Georgia. Plaintiff Best Carpet owns bestcarpetvalue.com, a website on which Google posted unwanted advertisements when that website was viewed through Google's Android phone Search App, without Plaintiff's consent and without paying Plaintiff compensation. Google's misconduct diminished the value of Plaintiff's website and damaged Plaintiff's reputation and business, leading or potentially leading to lost customers, lost sales and lost goodwill.

(b) Plaintiff Thomas D. Rutledge ("Rutledge") is a resident of California. Rutledge owns thomasrutledgelaw.com, a website on which Google, on information and belief based on Plaintiffs' investigation, posted unwanted advertisements when that website was viewed through Google's Android phone Search App, without Plaintiff's consent and without paying Plaintiff compensation, diminishing the value of Plaintiff's website and damaging Plaintiff's reputation and business and leading or potentially leading to lost clients, lost income and lost goodwill.

10.     Defendant Google LLC is a Delaware limited liability company with its principal office or place of business at 1600 Amphitheatre Parkway, Mountain View, California. Google LLC transacts or has transacted business in this district and throughout the United States.

**JURISDICTION AND VENUE**

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because there are at least 100 members of the proposed Class, at least one of whom is a citizen of a different state than Defendant, and the aggregate amount of the Class's claims in controversy exceeds the sum of $5,000,000, exclusive of interest and costs.

12.     Venue is proper pursuant to 28 U.S.C. §1391 because many of the acts and transactions giving rise to this action occurred in this District, and Defendant resides and is subject to personal jurisdiction in this District.

13.     Intradistrict Assignment (L.R. 3-2(c) and (e) and 3-5(b)): This action arises in Santa Clara County, in that a substantial part of the events which give rise to the claims asserted herein

---

Google can just as easily restore the unlawful advertising function to the Search App by issuing a future update at any time, unless it is permanently enjoined from doing so.

occurred in Santa Clara County. Pursuant to L.R. 3-2(e), all civil actions which arise in Santa Clara County shall be assigned to the San Jose Division.

## SUMMARY OF ALLEGATIONS

14.    American businesses must pay an agreed price to advertise their goods and services on other companies' media properties. That is because publishers have an absolute First Amendment right to control the content and presentation of their publications, including their marketing materials. Accordingly, the customs, norms and expectations throughout the commercial marketplace are that companies that want to advertise on media published by others must obtain the publishers' consent and pay for the privilege.

15.    A TV monitor manufacturer like Samsung, for example, does not have the right, simply because it makes the TV's hardware and software, to superimpose its own logo on viewers' TV screens in a manner that blocks from view a portion of a $3 million Nike Super Bowl commercial. Nor can Samsung lawfully program its monitors to superimpose competing ads that block the entire Nike ad from view in order to promote Samsung's own products or those of Nike's competitors. Samsung could not—without violating Nike's property rights and First Amendment rights—affirmatively prod TV viewers into watching, instead of the Nike spot, an unpaid-for Adidas commercial or a 30-second news clip disparaging Nike.

16.    Google likewise has no right to superimpose ads on Plaintiffs' websites simply because Google makes the Android operating system and Search App software through which Android users view Plaintiffs' websites on their mobile phone screens. Yet that is precisely what Google has done.

17.    Google could not in the brick-and-mortar marketplace lawfully plant its logo on Plaintiffs' storefront windows without Plaintiffs' consent, even if Google owned their buildings. Nor could Google place ads in Plaintiffs' marketing brochures or superimpose ads on top of Plaintiffs' print advertisements without Plaintiffs' permission and without paying Plaintiffs' price. Likewise, Google cannot in the online marketplace unilaterally superimpose ads on Plaintiffs' website without Plaintiffs' consent and without compensation just because Google makes the software through which Android users view that website on their mobile screens.

18.     Yet, for two years, that is precisely what Google did to Plaintiffs and other website owners across the country. Google abused its control over Android mobile phones and its dominant positions in the internet search and internet advertising markets to plant non-consensual, free advertising on up to 100 million U.S.-based websites when those websites were viewed by the 50 million U.S. Android owners who use Google's Search App.

19.     Google owns the world's largest internet advertising network and knows that advertising on Plaintiffs' and the Class's websites would have cost Google billions of dollars if Google purchased it honestly in the well-developed internet advertising market.

20.     Google, however, used its market dominance to unfairly and unjustly circumvent that market to extract free advertising from website owners and to obtain ill-gained revenues.

21.     Google's cost-free ads diminished the value of the affected websites by forcing their owners to endure the unexpected and unwanted risk that Android users who opened their websites would be distracted and diverted by Google's ads to a competitors' or hostile party's website, costing the website owners goodwill and prospective sales.

22.     Google knew that forcing website owners to advertise for Google and for the owners' competitors and detractors was harmful and contrary to the website owners' rights and interests. Google typically did *not* place its free-rider ads on, or withdrew them from, its own websites and those owned by many if not most of Google's advertising network clients.

23.     Google also did not impose its non-consensual free-riding ads on websites owned by many powerful corporations and other large commercial entities. Instead, Google exploited its power in the internet search, advertising and Android markets to injure predominantly small to mid-sized business and individual website owners.

24.     While many of the affected American website owners were unaware that Google's Search App imposed free-riding and harmful ads on their websites, Google's implicit message to the website owners who did learn of Google's conduct was effectively "pay us to advertise for you or we'll make you advertise for us and for your competitors and detractors for free." In substance and effect, Google exercised its combined power in the Android, internet search and internet advertising markets to coerce Plaintiffs and the Class to buy advertising services from Google if

CLASS ACTION COMPLAINT

they wanted Google to stop plastering their websites with Google's harmful cost-free advertisements.

25.     Because Google exerts enormous power in the internet advertising and search engine markets, many website owners who learned of Google's practices succumbed to paying Google's high advertising rates or refrained from challenging Google's offensive conduct for fear that Google would retaliate by deleting or burying links to those owners' websites deep within Google's search engine results pages, causing the website owners to lose substantial sales or potentially driving them out of business.

26.     In short, Google's non-consensual free-riding ads unjustly deprived website owners of advertising revenues, extracted undue profits for Google, trampled on website owners' free speech and property rights, reduced the value of their websites, and in many cases damaged the website owners' sales and reputations by forcing them against their interests to advertise for their competitors and detractors on their own websites. Google's unlawful and unjust conduct should be permanently enjoined, and Plaintiffs and the Class should be compensated for the free-riding ads that Google imposed on their websites and for the resulting diminished value of their websites.

## GENERAL FACTUAL ALLEGATIONS

### A.     The Internet

27.     The internet is a global network of interconnected computers and smaller computer networks that, through use of standardized computer protocols, enables internet-connected sources to provide information, documents and other communications to other internet-connected parties who seek or are designated by the source to receive them. Parties connect to the internet through cable (wired), wireless or fiber-optic technologies.

28.     No one owns the internet. It is in the public domain, and it generally can be accessed and used freely in the United States by any party that connects to it.

29.     Companies like Google and other organizations, including governmental entities, do own large portions of the physical infrastructure that supports the internet, such as data centers, routers, exchange points, satellites and the cable and fiber-optic "backbones" that shuttle data between different computer systems around the globe.

30.     Private companies like Google also manufacture and sell the devices that serve as component parts of the internet, such as the computer servers that host websites and the computers, monitors and mobile devices on which internet users view websites.

31.     Private companies also serve as "Internet Service Providers" by which individual desktop computer and mobile device owners and website publishers can connect to the internet.

32.     Private companies, including Google, also manufacture software products, such as web browsers and web search engines, that enable internet users to search for websites and other information on the internet and to read them on their computer monitors or mobile device screens.

33.     Like manufacturers of products used in the natural world, who cannot freely impede upon the real and personal property rights of individuals or other businesses, the manufacturers of internet-related products and services do not have free rein to trample on the virtual real estate or personal property rights of other internet participants.

**B.     <u>Websites and How They Work</u>**

34.     A website is a digital document built with software and housed on a computer called a "web server," which is owned or controlled in part by the website's owner. A website occupies physical space on the web server, which can host many other documents as well.

35.     Commercial websites typically have a unique "domain name" or "URL" (Uniform Resource Locator) address, such as www.newco.com, which enables an internet user to find the web server on which the website resides.

36.     All websites have at least one page, called a homepage, a copy of which is loaded into the computers of internet users who access the website. Most websites have additional pages that can be loaded and viewed by clicking "links" to them that appear on the homepage.

37.     Once a website is "published" and becomes "active," internet users can view and interact with the website by entering its domain name into an internet "browser" program located on their desktop computers or their mobile devices, such as Google Chrome, Mozilla Firefox or Microsoft Edge.

38.     Internet users can also find a website by entering "search terms" into the "search bar" (or "search box") of an internet search engine such as Google.com, Yahoo.com or Bing.com.

CLASS ACTION COMPLAINT

Performing searches on search engines yields "search results," which are indexes (typically in list form) of websites or documents that are potentially responsive to the user's search terms. If the user clicks a "link" (or "hyperlink") to a website that appears in the search results, the user's internet browser will connect the user to, and upload a page from, the website.

39.    The browser does this by finding and connecting to the web server hosting the website. The browser then obtains a copy of the requested website page from the host web server and delivers the copy to the user by translating the website's codes and recreating the website page on the user's computer monitor or mobile device screen.

40.    Website pages are transmitted from their host web servers over the internet to a user's screen much like television programs and commercials are transmitted from a broadcasting station to a home's TV monitor. The pictures and sounds stored at the TV station are reduced to binary code and sent to a receiver, where they are reconstructed into an identical copy of the source pictures and sounds and presented on the TV's screen and speakers.

41.    The technological capacity of websites, however, goes beyond that of television programs and commercials. Unlike those media, websites are usually interactive. Websites are not merely stored digital documents that can be transmitted and reproduced for passive viewing. Websites are designed to enable two-way communications with internet users, whose interactions with the copy of the website on their screen are transmitted back over the internet to the host web server, from which the hosted website can then transmit responsive information back to the internet user.

42.    The business purposes for building websites are to publish and publicize the website owner's business or message on the internet and, often, to induce and enable sales transactions with internet users or to generate advertising revenue through their page views.

43.    To business owners, websites are the cyberspace equivalent of several of the means by which brick-and-mortar businesses typically promote their brands and advertise and sell their products or services.

44.    Websites serve as a marquee by displaying the company's brand name or logo and identifying the business as a unique address on the worldwide web.

CLASS ACTION COMPLAINT

45.     Websites also serve the role of printed advertising flyers and marketing brochures by describing what the business does and how it meets consumers' needs.

46.     Many websites incorporate audio or video presentations describing the company and its products and services and, thus, serve as the cyberspace equivalents of radio or television commercials.

47.     Finally, many websites enable internet users to make purchases and transact other business with the website owners from the convenience of the users' homes, offices or, thanks to mobile devices, just about anywhere in the world. Websites thus serve as virtual storefronts that are loaded onto internet users' computers and mobile devices and appear physically as images and sounds on users' monitors and screens.

48.     As with their marquees, flyers, sales brochures, TV or radio commercials, and storefronts in the natural world, businesses design and build their websites to promote their *own* brands and to market their *own* products and services as they see fit, using logos, images and words of their *own* choosing.

49.     Websites are just as proprietary to their owners, who invest considerable sums, time and energy to develop, maintain and publish them, as business owners' real-world marquees, advertisements and brick-and-mortar shops.

50.     For many business owners, their website *is* their business. Millions of businesses thrive on the internet alone without any physical stores or offices. Websites are property, just like real estate and other assets, that can be appraised and valuated, bought, sold, converted and trespassed upon.

51.     By rights of ownership—and under the First Amendment—website owners are entitled to control the content and information displayed on their websites' web pages, including any advertisements, without interference from third parties like Google.

52.     The owners of television programs and commercials have property rights and free speech rights and commercial interests not only in the original source physically stored at the broadcast facility, but in that source's output as well—the copies that are reproduced on TVs.

CLASS ACTION COMPLAINT

53.     Website owners likewise have property rights, free speech rights and commercial interests in the copies of their websites that appear on internet users' monitors and screens. Google cannot lawfully interfere with those rights by superimposing non-consensual ads onto Plaintiffs' and the Class's websites simply because Google controls the Android operating system.

**C.     Google's Offending Search App**

54.     Google operates several internet related businesses that provide a variety of internet related products and services.

55.     Google has leveraged three internet products in which it has commanding market power to obtain billions of dollars of free advertising on Plaintiffs' and the Class's websites.

56.     First, Google makes and controls Android mobile phone software, including the Android operating system, that allow users to wirelessly access the internet.

57.     Second, Google owns and operates the world's most used internet browser, Google Chrome, and the world's most-used internet search engine, google.com.

58.     Third, Google owns the world's largest internet advertising network, offering products serving every aspect of that industry, including Google Ads (for clients advertising on Google's search results pages), AdSense (matching buyers and sellers of display advertising on websites), and AdX (for buyers and sellers of premium, high-end website display ads).

59.     Android phone users can search the internet in two ways. One, they can open a browser, for example Chrome, by clicking an icon on one of their Android home screens. Once they open the browser, users can then enter their search terms into Chrome's search bar or into a "navigation bar" that appears at the top of the browser's interface on their screen.

60.     Two, users can use Google's Search App, currently incorporated into virtually every Android phone, which eliminates the need to click an icon before conducting an internet search. The Search App enables users to input—by typing or through voice commands—search terms into a search bar to obtain and link to search results immediately. The Search App eliminates the inconvenience of having to first open a browser.

61.     Below are two "screenshots" of a typical Class Period Android mobile phone home screen. The Google Search App search bar appears at the top in both photos. In the first photo, the

1    phone's owner placed the Chrome icon directly below the search bar. In the second photo, the

2    Chrome icon is not on the first page of the home screen at all. That Android user would have to flip

3    to the home screen's second or third page to access Chrome.



21    62.    Since March 2018, virtually all Android phones placed the Search App's search bar

22    on the home screen. Before then, to use the Search App, many Android users had to click the "G"

23    icon that appears in the suite of Google apps that Google installs on Android phones. (See the

24    second icon at the bottom of the above home screen photos, enlarged below.)



CLASS ACTION COMPLAINT

63.     Android users entering keywords on the Search App's search bar receive virtually the same search results they would get if they entered the same search on Google Chrome.

64.     Search App users also retrieve the same websites when they click links on the Search App's results page that they would retrieve if they clicked those links on Chrome search results— but with one material difference during the Class Period: most websites retrieved via the Search App, when activated by an Android user's touching and toggling of their phone's screen, had Google's unlawful ads superimposed on their homepages or other "landing" pages. Google's illicit ads did not at any time appear on websites retrieved through Google Chrome.

**D.     Google Updated its Search App to Superimpose its Free Ads on Websites**

65.     Google's Search App was launched in 2010. For its first eight years, the program did not superimpose free advertisements on non-Google websites. That changed in late March 2018, when Google quietly—without any public announcement—updated its Search App software (i) to induce Android users to use the Search App instead of Chrome, and (ii) to superimpose free-rider advertisements on the Plaintiff Class's websites.

66.     As illustrated by the below screenshot of a typical Android home screen, Google's March 2018 update placed the Search App's search bar conspicuously at the top of the first page of most Android home screens. Google placed the Search App search bar in that convenient location to steer Android owners into using the Search App whenever they searched the internet. Google did not inform Android users—and few users realized—that the Search App is different than, and functioned differently with respect to ads than, Chrome. Most Android users think they are using Chrome when they use the search bar at the top of their home screens and do not know they are really using the Search App. Because the Search App is preloaded on Android phones, and Google at times used the same logo for both Chrome and its Search App, most users do not realize the Search App is a separate program. Google capitalized on this user confusion to steer Android users into using the Search App exclusively or predominantly in lieu of Chrome.

67.     The Search App search bar bears Google's "G" logo and, in the below example, references Google's trademark Android "Assistant."

CLASS ACTION COMPLAINT



68.     There are approximately 50 million Android phone users in America. Since March 2018, virtually all of them have used the Search App's search bar to search the internet.

69.     When Android users input internet search terms into the Search App's search bar, the Search App provides the user with pages of search results, which appear on the Android user's screen as a list of websites and other documents available on the internet that are responsive to the search request according to Google's search algorithm.

70.     The names of the websites on the search results list contain hyperlinks to those websites. Android users click a website's name if they want to visit that site. When users click on a website, Google's search results page disappears from their screens and is replaced by the sought-

1   after website's homepage. Sometimes Google's search results will list links to other landing pages

2   from a website below the link to its homepage. An Android user who clicks one of the other pages

3   will summon that page to their Android screen rather than the website's homepage. An example of a

4   Search App search result with links to Plaintiff Best Carpet's homepage (blue link at top) and other

5   landing pages (blue links within rectangles) appears below:



21   71.   As a result of Google's software updates between March 2018 and April 2020,

22   Plaintiffs' and the Class's website homepages or other landing pages, when viewed through

23   Google's Android Search App, were cut off at the bottom, where the website owners' words or

24   images were blocked from view and replaced by a Search App-generated Google "leaderboard"

25   advertisement.

26   72.   Google's leaderboard was emblazoned with Google's multicolored logo, and, by

27   early 2020, it invited Android users to "VIEW 15 RELATED PAGES." (Earlier versions invited

28   users to view no more than 10 so-called "Related Pages.")

CLASS ACTION COMPLAINT

73.     To illustrate, when a Search App user clicked Plaintiff Best Carpet's homepage link on a search results page during the Class Period, Best Carpet's proprietary homepage appeared on the user's mobile screen (see first image below). Best Carpet's homepage invites visitors looking for specific products, from "Carpet Tiles" to "Cove Base," to click internal links to specialized pages within Best Carpet's site for each product. Once a user engaged Best Carpet's website by toggling its homepage, however, Google's Search App activated and superimposed Google's leaderboard ad on top of Best Carpet's website, blocking the bottom of Best Carpet's homepage entirely from view—including Plaintiff's invitation encouraging prospective customers to view its "Cove Base" products (see second image below). Google's logo-emblazoned leaderboard invited Best Carpet's visitors to instead "VIEW 15 RELATED PAGES" selected by Google.



74.    Google's leaderboard had a pop-up button (encircled triangle at bottom right of second image above). When that button was clicked, Google's leaderboard expanded to *take over the entirety of Best Carpet's website homepage*. When the pop-up button was clicked, the Search App superimposed two half-page "banner" ads that blocked 80% of Best Carpet's own First Amendment-protected and proprietary content and simultaneously shadowed and obscured the other 20%, including Best Carpet's domain address, as shown below:



75.     As the above image makes clear, this happened *on Plaintiff's website*. It is Best Carpet's URL—bestcarpetvalue.com—that appeared in the navigation bar at the top of the screen, not Google's URL. While technically it occurred on the copy of Best Carpet's homepage that was reproduced on the Android user's screen (*see* paragraphs 39-40 above), that copy is Best Carpet's property, not Google's property. Internet users, moreover, think they are visiting Best Carpet's website whenever Best Carpet's URL appears in the navigation bar. From their perspective, it looked like Best Carpet itself placed or expressly permitted Google's ads on its website when, in reality, Google superimposed those ads on Best Carpet's website without Best Carpet's consent.

76.     The above image also shows that Google's 15 "Related Pages" were themselves half-page banner ads. These ads were designed entirely by Google's software. The half-page banner ads were revealed two pages at a time as Android users scrolled through Google's expanded leaderboard. Each banner ad contained a link that, if clicked, redirected the Android users from the host website's landing page (here, Best Carpet's homepage) to another web page.

77.     Google's Related Pages banner ads routinely included ads for the host website's *competitors*. Google superimposed as many as 15 ads for a host's competitors on the host's own website. Android users who clicked a competitor's ad were re-routed by the Search App from the host's website to the competitor's website.

78.     Google's non-consensually imposed half-page banner ads were also often links to news stories about the website's owner—sometimes negative stories that the owner would never voluntarily post on its site. Users who clicked a news story ad were redirected by the Search App from the host website to the news source's website.

79.     Neither of the two above-shown Related Pages banner ads that Google placed on Best Carpet's homepage were links to other web pages on Best Carpet's own website. Instead, both were ads for one of Best Carpet's direct competitors, Interface Inc., which is a "global commercial flooring company" that, like Plaintiff Best Carpet, sells carpet tiles and luxury vinyl tile. *See* interface.com (last visited July 14, 2020).

80.     Search App users who clicked the Interface half-page ads were immediately transported away from Best Carpet's website to Interface's website, where they viewed Interface's

1   web content and, potentially, bought Interface's competing products instead of Best Carpet's

2   products. Notably, Google's Search App did not impose Related Pages banner ads on Interface's

3   website if that site was accessed from the half-page banner ads Google placed on Best Carpet's site.

4   The users who were transferred to Interface's website, thus, did not see Google-placed ads for Best

5   Carpet that might have nudged the users back to Plaintiff's website.

6       81.   On February 24, 2020, as one example during the Class Period, eleven of the 15

7   Related Pages ads that Google imposed on Best Carpet's website were ads for Best Carpet's

8   competitors. Search App users who clicked those ads were diverted from Best Carpet's site to a

9   competitor's site, where they could buy competing products instead of Best Carpet's products.

10      82.   The half-page ads that Google's Search App imposed on Plaintiffs' and the Class's

11  websites were not ads that appeared elsewhere on the internet. Rather, Google's software itself

12  constructed those ads by scraping information from the supposedly "related" websites and

13  reconfiguring that information into an ad, using a Google artificial intelligence program.

14      83.   The competitors' ads imposed on Plaintiffs' and the Class's websites by Google's

15  Search App mimicked legitimate ads those competitors might themselves have placed (if they

16  could) to try to steal Plaintiffs' and the Class's potential customers.

17      84.   Google's banner ads appeared on Best Carpet's website whether the Android user

18  searched for "carpet sellers near me," Plaintiff's name "Best Carpet Value," or its precise domain

19  address "bestcarpetvalue.com." Regardless of the search terms used, Search App users who linked

20  to Plaintiff's website saw Google's leaderboard ads. They also saw Google's banner ads for

21  Plaintiff's competitors if they clicked the leaderboard pop-up button.

22      85.   Search App users never received notice from Google advising them that Google had

23  imposed its leaderboard or Related Pages banner ads on Plaintiffs' websites without Plaintiffs'

24  consent. Nor did Google ever advise Search App users that the competitors' ads or negative news

25  articles that appeared as Related Pages were neither endorsed by Plaintiffs nor intended to imply an

26  affiliation or relationship existed between Plaintiffs and the competitors or negative news sources.

27      86.   Plaintiffs and other businesspeople buy, build and maintain websites to promote and

28  market their *own* brands and businesses. Few website owners would willingly advertise for a direct

competitor. But for two years, throughout the country, because Google took over website homepages and other landing pages retrieved via Android's Search App, website owners were forced—without their consent, without compensation and usually without their knowledge—to advertise for their competitors and detractors.

87.    Companies publish websites to attract viewership and customers. They design their web pages to capture viewers' attention and fill web pages with content they anticipate will engage viewers' interest and draw them further into the website. Website owner's interests are best served if their web pages succeed in steering viewers deeper into their site where the owner might earn advertising revenue or secure sales of its products or services. Most website owners design a version of their websites specifically for mobile devices, which have different display parameters than desktop computers, and plan their sites to fill the limited space on mobile screens without expecting third parties like Google to intrude upon their space.

88.    Google's non-consensually imposed ads intruded on website owners' limited space and created immediate distractions that threatened to undermine every web page's central purpose. Google's leaderboard used Google's widely recognized logo to catch a website viewer's eye and entice them to "View" supposedly "Related Pages" by clicking a pop-up button which, if clicked, expanded the leaderboard to obscure the host's website entirely from view.

89.    Through Google's improper and overreaching conduct, auto body shop websites— contrary to their owners' commercial interests—were compelled to advertise for competing auto body shops. Bakery websites unwittingly advertised for other bakeries in the same town. Caterers' sites unknowingly promoted other nearby caterers. And so on down the alphabet for nearly every conceivable industry.

90.    During a period in 2018, even the New York Times online newspaper, when viewed through Android's Search App, contained Google Related Pages ads linking to four competing online publications, the Washington Post, the Guardian, Huffington Post, and New York Post:



91.     Google's non-consensually imposed ads also forced professionals—accountants, doctors, lawyers—to advertise for competitors on their websites, threatening reputational and financial harm to the website owners. Attorneys in many jurisdictions have ethical constraints limiting their permissible advertising. Law firm and attorney websites accordingly rarely advertise at all, certainly not for unaffiliated lawyers. Yet Google's Related Pages banner ads regularly advertised for unaffiliated lawyers on attorney websites. These ads could be misperceived by Android users as endorsements of the unaffiliated lawyers or to imply a partnership or working relationship among the lawyers when none existed.

92.     Even government websites were not immune from Google's illicit ads, which in the government context were exceedingly inappropriate. Some federal courthouse websites displayed surreptitiously imposed Google ads promoting local law firms or other local businesses. Such ads could be read by Android users as the courts' endorsing or favoring certain legal service providers over others who practiced in the same courthouse, undermining the courts' imperative to appear and be at all times impartial and unbiased. This Court's website and the District of Connecticut's New Haven courthouse website were two examples:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



93.    Even the President of the United States was affected by Google's offensive Search App. The homepage of the President's 2020 campaign's website, donaldjtrump.com, was for a time taken over by Google's leaderboard and Related Pages banner ads when opened through the Search App. In February 2019, one of Google's half-page pop-up ads linked to a CNN portal called "Donald Trump News" that frequently contained adverse news stories about the President:



It is unlikely that the President's campaign would knowingly and willingly advertise for Google or CNN without compensation, or would agree to post adverse CNN news links on its website's homepage, had Google sought the campaign's consent rather than unilaterally imposing that ad. According to publicly available data, the Trump campaign's website is viewed by more than 10 million internet users every month, a substantial percentage of whom are Android users. Using standard internet advertising rates, Google should have paid, and by law owes, the Trump campaign hundreds of thousands of dollars for advertising on its website.

94.     Google's offending banner ads and half-page pop-up ads appeared even on websites that already ran their own advertising platforms. Website owners often sell display advertisements to other businesses and place them at the bottom of their web pages—exactly where Google's offending leaderboards appeared. Google's non-consensual ads directly competed with these website owners' advertising programs and interfered with their advertising revenue streams.

95.     In some cases, Google's ads appeared on top of the owners' ads, blocking them partially from view. As shown in the screenshots from the classmates.com website below, Google's leaderboard partially blocked the website's own leaderboard ad for Fidelity Investments when the website was viewed via the Search App. A user clicking the website owner's Fidelity ad generated revenue for the website owner if the ad was paying on a "per click" basis, but clicking Google's leaderboard ad that Google planted on top of the website owners' Fidelity ad did not.



96.     Google did not subject every company's website to Google's non-consensual ads. Google's leaderboard and Related Pages banner ads did not appear on Google's own websites or on those of its major competitors such as Yahoo.com, Apple or Microsoft, or Google's regular Android device contractual partners like Samsung's mobile phone site, AT&T Mobility or Verizon.

97.     Google also limited the harmful impact of its Related Pages banner ads on Google's own advertising clients' websites. Many website owners pay Google to place ads for their website high on Google's search results pages. Before January 25, 2019, if an Android user clicked a Google client's paid ad to view the client's website, the Google leaderboard often appeared at the bottom of the homepage but stated "VIEW 0 RELATED PAGES" rather than 10 or some other number. If the pop-up button were pressed, the expanded banner was blank, showing no half-page ads at all, as seen in the below screenshots (website owner's name, URL and other identifying information omitted):



98.     Following an Android operating system update on January 25, 2019, clicking a Google client's paid ad on Search App results pages typically no longer displayed Google's leaderboard or banner ads on that client's website. If Google's advertising clients' *paid ads* were clicked, the clients were spared from being forced to display ads for Google or for their competitors and detractors.

99.     However, most Google clients' websites were also listed elsewhere on Google's search results page in a form other than a paid ad—specifically, in the list of what Google calls its

1  "organic" search results, which typically appear below the paid ads. If the client's organic listing

2  was clicked by a user, Google's leaderboard and banner ads often still appeared.

3      **E.      Google Profited Directly from its Free Ads on the Class's Websites**

4      100.    Google's Search App not only placed cost-free ads, Google derived substantial

5  revenue from those free riding ads. Google's unlawful ads *always* advertised for Google itself by

6  placing Google's logo on every leaderboard. And the half-page pop-up banner ads were often for

7  Google's own products and services, such as YouTube (which Google owns).

8      101.    For example, Google at one time imposed cost-free ads on Fox News' homepage at

9  foxnews.com. In early March 2019, the Fox News site headlined an article critical of the Green

10 New Deal. Google gratuitously imposed a leaderboard ad below that headline referring to "4

11 RELATED PAGES," two of which were advertisements for YouTube videos, including a "The

12 Daily Show with Trevor Noah" video. Clicking that half-page ad transported Android Search App

13 users from Fox News' website to a YouTube page that immediately ran a video advertisement from

14 Tom Steyer arguing that the President should be impeached:



CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13



14  Had it been asked, Fox News likely would not have consented to Google's free ads diverting Fox

15  News' viewers to Steyer's video. *See* www.politico.com/story/2017/11/06/steyer-claims-fox-

16  breach-trump-impeachment-ad-244606. But Google did not seek consent, and its diversion

17  generated revenue for Google whenever Steyer's video ran or was clicked by a diverted user.

18  Google also generated revenue from its foxnews.com leaderboard in two other ways: every time a

19  diverted viewer (i) clicked a "Subscribe" button next to a Daily Show ad that appeared on the

20  YouTube page below Steyer's ad; or (ii) clicked a Yahoo.com ad at the bottom of the YouTube

21  page. Fox News' website is viewed by more than 50 million internet users every month, a

22  substantial percentage of whom are Android users. Using standard internet advertising rates, Google

23  should have paid, and by law owes, Fox News several million dollars for advertising on its website.

24      102.    A major motive for Google's Related Pages advertising scheme was to enable

25  Google to monetize its organic search results through the Search App. Internet users who search for

26  websites using Google's search products retrieve search results that show Google's clients' paid ads

27  on top of the organic results. Below is an example of a typical Google search results page, this one

28  seeking an allergist in central New Jersey:

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18



19    103.    The top two search results above are links to websites of Google clients who pay

20  Google fees each time an internet user clicks the embedded link to the clients' websites. That they

21  are Google advertising clients is denoted by the green ⬚Ad symbol next to their links. The last

22  three search results are organic listings identifying website owners that did not pay Google. If this

23  search were run on Google Chrome or the google.com search engine instead of on the Search App,

24  Google would receive income if the internet user clicked one of the paid ads but not if the user

25  clicked one of the organic results.

26    104.    Before March 2018, the same would have been true if an Android user ran the search

27  on the Search App; Google received revenue if its advertising clients' links were clicked but did not

28  receive revenue if an organic result was clicked.

CLASS ACTION COMPLAINT

105.    By updating the Search App in March 2018, however, Google enabled itself to earn revenue and other benefits from its organic results. First, Search App users who clicked organic results began to see Google's unpaid-for leaderboard at the bottom of the websites. Google immediately received an intangible benefit because Google's logo was advertised on the site.

106.    Second, when Search App users clicked the leaderboard pop-up button, they often saw half-page banner ads for Google sites or Google advertising clients whose websites contained Google-placed ads. If the users clicked one of those banner ads, transported to the Google or Google client site, and then viewed or clicked a Google-placed ad, Google received revenue.

107.    To illustrate, in mid-2019, a Search App search for a New York City area moving industry company yielded an organic result listing a company called herein by the pseudonym "Company A." Clicking Company A's name led users to a second organic listing that contained links to that company's homepage and several other website landing pages, including a page titled "About Us."

108.    A Search App user clicking the About Us link transported to Company A's URL and retrieved a copy of that landing page. When the Android user scrolled Company A's landing page, Google's logo-bearing leaderboard appeared on top of Company A's own messaging and content.

109.    When the Related Pages pop-up button was clicked, the leaderboard expanded to take over Company A's webpage, covering Company A's entire message promoting its own products and services with Google's banner ads. (See paragraph 112 below.)

110.    Five of the ten banner ads that popped up were ads for Company A's competitors in the moving industry, including Home Depot, U-Haul and two smaller New York area direct competitors called Jugglebox and EZ Bins. Three other half-page ads were links to articles about Company A's industry, and a fourth banner ad was for a coupon website (Groupon). Each of those four ads promoted Company A's competitors without mentioning Company A at all.

111.    Three of those four websites were owned by Google clients whose websites included numerous Google-placed display ads that, if viewed or clicked, generated revenue for Google.

112.    As shown below, a businessinsider.com ad superimposed on Company A's web page advertised for a competitor called Gorilla Bins by way of a news article headlined "Gorilla Bins are

amazing for moving." A user who clicked that ad was transported from Company A's landing page to Business Insider's URL and its article about Gorilla Bins:




113.   Users diverted to Business Insider's webpage who read the Gorilla Bins article saw several Google-placed display ads on Business Insider's site. The ad shown below was for a company called Certified stating that company was "The industry leader in management, relocation, installation and storage." (See first screenshot below.) Closing that ad by clicking the blue "x" at the top right of the ad revealed that it was placed by Google, which earned fees if the ad was viewed or clicked. (Second screenshot below.)






114.   Google's Search App also imposed half-page pop-up banner ads on Company A's website for a wikiHow.com article on "How to Get Free Moving Boxes" and a MyFirstApartment.com article on "How to Save" on "Renting Moving Bins and Boxes." Both articles also contained Google-placed display ads that generated revenue for Google when viewed or clicked, as shown in the following screenshots:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



115.     Google is not entitled to generate revenues and free advertising benefits for itself by trampling on other website owners' First Amendment and property rights.

116.     Under the law, Google could have and should have monetized its organic results by seeking Plaintiffs' and the Class's permission and purchasing its ads honestly in the digital advertising marketplace. Instead, Google illegally used its technology and leveraged its dominant positions in the Android, internet search and digital advertising markets to circumvent the need for website owners' consent and to avoid paying for its ordinarily expensive ads. Moreover, it did so with intentional or reckless disregard for Plaintiffs' and the Class's property and free speech rights and the competitive harm, lost sales and lost goodwill its Search App algorithm inflicted on them.

### F.     Tens of Millions of Android Users Saw Google's Unlawful Banner Ads

117.     Since March 2018, Google has installed its Search App on every new Android phone sold and, through operating system updates, has installed the Search App on virtually all older Android phones capable of accepting the update that remained in use.

118.     According to publicly available data, almost 275 million U.S.-based internet users searched the internet in 2018, and they visited an average of 89 websites per month.

119.     Approximately 50 million of those 275 million internet users searched the internet using an Android phone. Given the convenient and prominent placement of the Search App's search bar on each Android phone's home screen and its one-step searching capability, Google's records are expected to show that Android users routinely used the Search App during the Class Period to find websites on the internet, and that few if any Android users ignored the Search App and, instead, routinely used the more cumbersome two-step method of searching the internet via Chrome or another browser.

120.     Consequently, on information and belief, all or virtually all of the 50 million Android users have seen Google's leaderboard and banner ads on websites that they viewed on their Android phones during the Class Period.

CLASS ACTION COMPLAINT

**G.** **Google would have Paid Premium Prices for its Banner Ads if Google Bought them in the Well-Developed Internet Advertising Market Instead of Imposing them without Consent via the Search App**

121.    Advertisers spend enormous sums to buy ads on internet websites.

122.    Google is a dominant presence in the internet advertising market. In each of the last three years—2017, 2018 and 2019—Google earned more than $100 billion in revenues from its internet advertising operations.

123.    Google operates the world's largest internet advertising network. Clients of Google's advertising platform include website owners that pay Google fees to obtain greater visibility on Google search results pages.

124.    Google's ad network customers also include advertisers that pay fees to place ads on Google's own proprietary websites, such as YouTube and Google Maps.

125.    Google's ad network customers also include website owners that sell space on their websites to advertisers, as well as advertisers that buy that space. Google serves as an intermediary connecting those buyers and sellers and keeps a large percentage of the advertising fees earned by the websites.

126.    Given its major roles on all sides of the internet advertising market, Google knows the market's technology, mechanics and pricing structures well.

127.    Website display ads such as Google's Related Pages leaderboards and half-page banner ads come in a variety of shapes and sizes. This available variety serves different advertisers' varied budgets and differing strategies for driving an ad's visibility on the internet.

128.    Conventional wisdom—which in internet advertising is data driven—holds that ads placed on website homepages have greater visibility than those placed on other web pages because more internet users who visit a website land on homepages than on other pages within the site.

129.    Consequently, homepage ads can cost 2 to 10 times more than ads on other pages.

130.    Web pages can accommodate many ads at once. Advertisers that want to be the exclusive advertiser on a particular web page will pay a premium for the right to block other advertisers from placing ads on that page. An exclusive ad on a web page is known as a "Roadblock."

131.    Putting a Roadblock on a website's homepage is referred to as a "Homepage Takeover." Homepage Takeovers are one of the most expensive forms of internet advertising.

132.    The ads that Google superimposed on Plaintiffs' and the Class's websites through Android's Search App were often very expensive Homepage Takeover ads.

133.    But Google paid the Class nothing for its homepage ads or for any other ads it imposed through its Search App.

134.    An advertiser that purchases an internet ad honestly on the market typically works directly with the website's owner or advertising agent to place the ads on the original website on the owner's web server. That way, the ads appear whenever an internet user accesses the website, be it through a desktop computer or on a mobile phone or tablet.

135.    Google's Search App, however, used Android software to place Google's leaderboard and half page banner ads on the copies of the website pages that were retrieved by Android phone users.

136.    Using Android software to superimpose the ads enabled Google to place the ads without contacting the website owners, who frequently were unaware that their websites were littered with secretly placed free advertising when viewed on Android phones.

137.    Google thus used its superior technological ability and its control over Android's operating system to occupy valuable space on Plaintiffs' and the Class's websites and to obtain all the benefits of advertising on those tens of millions of websites free of charge.

138.    There are two primary pricing methods by which honest advertisers pay for ads placed on websites. One is called "pay-per-click," whereby the website owner is paid an agreed amount every time an internet user clicks the ad.

139.    The second method is called "cost per impression" (or CPI), whereby the owner is paid an agreed sum every time a web page containing the ad is viewed by an internet user.

140.    A commonly used variant of CPI is called "cost per mille" (or CPM), where the website owner is paid an agreed amount for every one-thousand impressions.

141.    Ads placed on the most popular websites, such as on Google's YouTube.com or Yahoo.com, are more expensive than adds placed on less frequently visited sites.

142.   For most of the 120 million active U.S. websites, however, the base cost to advertisers for each commonly used size of banner ad has become fairly standardized. The ultimate cost of each sized banner ad will depend largely on which website page the ad will appear and the degree of advertising exclusivity the ad will enjoy.

143.   Using the CPM method, the average cost in 2018 of the leaderboard ads that Google's Search App imposed was $30 CPM if placed on an internal webpage.

144.   A leaderboard on a homepage minimally cost double that amount and up to tenfold that amount depending on the number of ads the website owner placed on its homepage and the website's monthly visitor traffic.

145.   Had Google secured Homepage Takeovers of the Class's website homepages honestly in the market, Google could have placed ads that were seen on desktops and non-Android phones as well as by Android Search App users. In that event, Google likely would have paid the website owners that consented to Google's ads an average of three-to-five times the base $30 CPM price for its exclusive homepage leaderboard ads, or $90 to $150 CPM.

146.   Even after discounting to account for the fact that Google's leaderboards appeared on approximately 50 million Android phones rather than on all internet-capable devices, the unjust free advertising benefits that Google obtained via its free leaderboards imposed by the Search App alone (without considering the half-page pop-up ads) exceeded $2 billion during the Class Period.

147.   Google knows what its ads on Plaintiffs' and the Class's websites would have cost had Google honestly procured them on the market pursuant to arms-length negotiations.

148.   Google, however, knowingly and intentionally used its technology and control of the Android, internet advertising, and internet search markets to dishonestly procure the benefit of advertising on websites without paying a dime.

**H.   Google's Conduct was Manifestly Unjust**

149.   As shown above, between March 2018 and April 2020, Google placed non-consensual free advertisements on Plaintiffs' and tens of millions of putative Class members' websites. Without obtaining Plaintiffs' and the Class's consent, and without paying for the privilege, Google imposed on their websites, and caused tens of millions of daily Android users

viewing their websites to see, (i) Google's logo; (ii) half-page banner ads for Plaintiffs' and the Class's competitors and detractors; (iii) half-page banner ads for Google itself; and (iv) half-page banner ads for Google's advertising clients, which if clicked diverted Android users to other websites where those users could take actions that generated profits for Google.

150.    Google's knowing and deliberate secretion of billions of dollars' worth of advertising and undue profits from the Class was manifestly unjust for several reasons.

151.    *First*, Google participates in the well-established market that is used to set prices for website ads and knows how much it would have had to pay Plaintiffs and the Class if Google had bought its ads honestly instead of circumventing the marketplace.

152.    Google's misuse of its technological and market superiority to obtain ordinarily expensive advertising on tens of millions of websites free of charge is an unconscionable abuse of commercial power that reflects a high degree of moral turpitude. Google cannot in good conscience be allowed to retain the unjust benefits it obtained from website owners.

153.    *Second*, in pursuit of its unlawful gains, Google cavalierly trespassed on Plaintiffs' and the Class's personal property, materially devaluing their websites and exposing the website owners to potential reputational, professional and financial harm. Google cannot in good conscience be rewarded for its trespasses against tens of millions of website owners by being permitted to retain the benefits it derived from its trespasses.

154.    *Third*, Google trampled on website owners' First Amendment right to control the content and messaging of their own websites. Well-settled United States Supreme Court law holds that private entities cannot be forced against their will to convey messages from other private entities in their marketing materials. Google cannot in good conscience be rewarded for violating the free speech rights of tens of millions of website owners by being permitted to retain the benefits of those violations.

## CLASS ACTION ALLEGATIONS

155.    As detailed below in the individual counts, Plaintiffs bring this lawsuit on behalf of themselves and all others similarly situated, pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

156.    Plaintiffs seek to represent the following "Class":

> All persons or entities residing in the United States that owned websites that were active between March 2018 and April 2020 (the "**Class Period**") on which Google's logo and Related Pages banner ads appeared when their websites were viewed by Android mobile phone owners using the Search App.

157.    Plaintiff Best Carpet also seeks to represent the following "Georgia Subclass":

> All persons or entities residing in Georgia that owned websites that were active between March 2018 and April 2020 on which Google's logo and Related Pages banner ads appeared when their websites were viewed by Android mobile phone owners using the Search App.

158.    Plaintiff Rutledge also seeks to represent the following "California Subclass":

> All persons or entities residing in California that owned websites that were active between March 2018 and April 2020 on which Google's logo and Related Pages banner ads appeared when their websites were viewed by Android mobile phone owners using the Search App.

159.    Excluded from the above Class and Subclasses are Defendant and its officers, directors and employees.

160.    ***Numerosity***. Members of the Class and Subclasses are so numerous that joinder of all members is impracticable. While the exact numbers of Class and Subclass members remains unknown at this time, on information and belief, there are at least tens of millions of putative Class members throughout the United States and at least tens of thousands of putative members of the Georgia Subclass.

161.    ***Existence and Predominance of Common Questions of Law and Fact***. This action involves common questions of law and fact that predominate over any questions affecting individual Class or Subclass members. These common legal and factual questions include, but are not limited to, the following:

a.      whether an implied-in-law contract exists between Google and Plaintiffs and the Class and Subclass members because Google's Search App conferred free-advertising benefits and unjust profits upon Google as to which Google would be unjustly enriched if not ordered to pay restitution;

b.      if so, what is the proper measure of restitution;

c.      whether Google trespassed upon Plaintiffs' and the Class and Subclass members' websites because its Search App imposes Google-generated ads on Plaintiffs' and the Class and Subclass members' websites when viewed on Android mobile phones using Google's Search App;

d.      whether Plaintiffs and the Class and Subclass members sustained damages as a result of Google's trespasses;

e.      if so, what is the proper measure of such damages;

f.      whether Google's conduct alleged herein was performed with wanton, willful or reckless indifference and disregard for Plaintiffs' and the Class and Subclass members' rights such that Plaintiffs and the Class and Subclass members are entitled to exemplary damages;

g.      if so, what is the proper measure of exemplary damages; and

h.      whether Plaintiffs and the Class and Subclass members are entitled to declaratory and injunctive relief.

162.    *Typicality*. Plaintiffs' claims are typical of the claims of the members of the Class and Subclasses because *inter alia*, all Class and Subclass members were injured through Defendant's common misconduct described above. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all members of the Class and Subclasses.

163.    *Adequacy of Representation*. Plaintiffs will fairly and adequately protect the interests of the members of the Class and Subclasses. Plaintiffs have retained counsel experienced in complex commercial and consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Class or Subclasses.

164.    *Superiority*. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The expense and burden of individual litigation would make it impracticable or impossible for proposed Class and Subclass members to prosecute their claims individually. Most individual Class and Subclass members have little ability to prosecute an individual action due to the complexity of the issues involved in this litigation and the significant costs attendant to litigation on this scale compared to the relatively small damages suffered by most individual Class and Subclass members. Further, individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, a class action provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here. Trial of Plaintiffs' and the Class and Subclass members' claims is manageable as a class action, and economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured. Without a class action, the Class and Subclass members may continue to suffer injury and damages, and Defendant's violations of law may proceed without remedy while Defendant continues to retain the proceeds of its wrongful conduct.

165.    Defendant has acted and refused to act on grounds generally applicable to the Class and Subclasses by unjustly benefiting from cost-free advertising and trespassing on Plaintiffs' and the Class and Subclass members' website properties, thereby making appropriate final injunctive relief with respect to the Class and Subclasses as a whole.

## **CHOICE OF LAW**

166.    The law of California applies nationwide in this action.

167.    California has a significant aggregation of contacts to the claims of each Class and Subclass member because Google's corporate headquarters is located in California, the Search App updates at issue were made or orchestrated in, by or through Google's headquarters, and many millions of Class and Subclass members reside in California.

1    168.   Defendant cannot satisfy its burden of proving that the interests of other states

2    outweigh California's interests in having its law applied.

3    169.   First, as applied to the facts alleged herein, Google's alleged conduct, if proved,

4    would create an implied-in-law contract or constitute unjust enrichment warranting restitution in all

5    50 states. While the law of trespass to chattels may differ in some states, for the reasons stated

6    below, no state has an interest in applying its own trespass to chattels law that outweighs

7    California's interest in applying its state law to Plaintiffs' trespass to chattels claim.

8    170.   Second, to the extent there is a material difference between California's and another

9    state's laws under either claim, no state's interest in the application of its own law would truly

10   conflict with California's interests in applying its own law. No state's interest exceeds California's

11   interest, and every state's interests will be served and vindicated through the application of

12   California law under the circumstances of this case.

13   171.   Third, even if a true conflict among the states' interests in the application of their

14   own laws existed, California's interest would be the most impaired if another state's law were to be

15   applied to any Class or Subclass member's claims.

16   172.   In this case, Google's challenged conduct giving rise to an implied-in-fact contract

17   occurred predominantly or exclusively in California, so the contract is deemed to have been made in

18   California. The unjust enrichment that Google accepted in the form of cost-savings and undue

19   profits from its free advertising scheme are the final events for imposing liability for unjust

20   enrichment, and those events occurred in California when the cost-savings and undue profits

21   accrued on Google's books and records located at its California headquarters.

22   173.   Google's trespasses to chattels also predominantly occurred in California. While

23   Class and Subclass members reside in different states, many of their injuries occurred outside their

24   home states because Google did not trespass on the source websites located on the Class and

25   Subclass's web servers but, rather, trespassed on the copies of their websites that were loaded onto

26   internet users' Android phones throughout the nation. The locations of each Class and Class

27   member's injuries, therefore, are nationwide—and most predominantly in California, which has

28   more Android phone owners than any other state.

174.    Google is the only business that is alleged to have committed harm and which faces potential liability. California, accordingly, is the only state with an interest in setting an appropriate level of liability for companies conducting business within its borders. While other states may have an interest in protecting defendants that reside in their states, no state has a cognizable interest in preventing its resident plaintiffs from recovering against a California defendant in a California court, even if its citizens could not recover on the same legal theories had the defendant resided in their home states.

175.    Alternatively, if California law cannot be applied nationwide, any differences among the laws of the other interested states would be slight and would not require application of 50 different laws. Any differences that may exist, rather, can be grouped into a few discrete groups as to both the implied contract/unjust enrichment and trespass to chattels causes of action and, therefore, can be managed through the use of subclasses designated to adjudicate each of the few distinct groups of laws.

## FIRST CAUSE OF ACTION

(Implied Contract/Unjust Enrichment)

176.    Plaintiffs incorporate by reference all prior allegations made in this Class Action Complaint as if fully set forth herein.

177.    Plaintiffs assert this cause of action on behalf of themselves, the Class and the Subclasses.

178.    Defendant unjustly enriched itself by saving substantial advertising costs and earning undue profits at Plaintiffs' and the Class's and Subclasses' expense, and it did so through the coercive act of superimposing advertisements on their websites' homepages and other landing pages without obtaining their consent or paying them compensation.

179.    Defendant's unjust enrichment gives rise to an implied-in-law obligation and contract with Plaintiffs and each member of the Class and Subclasses requiring Defendant (i) to restore them to their original positions by making restitution to them equal to the full value of the cost savings benefits that Defendant unjustly obtained, and (ii) to disgorge and pay to them

1   Defendant's undue profits gained from its ads, which is proper here because Defendant's unjustly

2   earned gains exceed Plaintiffs' and the Class's and Subclasses' unjust losses.

3       180.    Defendant's conduct was knowing, willful, wanton and performed with deliberate or

4   reckless indifference to Plaintiffs' and the Class's and Subclasses' rights, warranting punitive

5   damages in an amount to be determined at trial.

6       181.    Defendant's conduct caused and threatens to continue to cause Plaintiffs and the

7   Class and Subclasses additional harms that cannot be adequately remedied by restitution or

8   damages, including the loss or impairment of Plaintiffs' and the Class's and Subclasses' First

9   Amendment rights to control the presentation and content of their own websites and the prospective

10  lost sales, lost future advertising revenue and lost goodwill resulting from Defendant's placement of

11  competitors' ads and links to disparaging news articles on their websites.

12      182.    Plaintiffs and the Class and Subclasses are accordingly entitled to a permanent

13  injunction requiring Google to forever disable the ad-generating feature of its Search App on every

14  Android phone on which it has been installed, and preventing Google from installing any similar

15  ad-generating code on any internet related devices or products in the future.

16                          **SECOND CAUSE OF ACTION**

17                              (Trespass to Chattels)

18      183.    Plaintiffs incorporate by reference the allegations made in paragraphs 1 through 175

19  of this Class Action Complaint as if fully set forth herein.

20      184.    Plaintiffs assert this cause of action on behalf of themselves, the Class and the

21  Subclasses.

22      185.    Defendant intentionally and without authorization interfered with Plaintiffs' and the

23  Class's and Subclasses' possessory interests in their proprietary websites by blocking 10% to 90%

24  of their website pages' content from public view and occluding the remaining content when viewed

25  on Android phones through Google's Search App.

26      186.    By obscuring and blocking the contents of the Class's website homepages when

27  viewed on Android's Search App, Google's ads substantially interfered with and impaired the

28  websites' published output and exposed the website owners to unwanted risks of lost advertising

revenues and lost sales to competitors, thereby materially reducing the websites' value and utility to the website owners. Defendant's unauthorized interferences proximately caused Plaintiffs and the Class and Subclasses actual damage by impairing the condition, quality and value of their websites.

187.   Defendant is accordingly liable to Plaintiffs and the Class and Subclasses for damages equal to the diminished market value of their websites. The lost market value of Plaintiffs' and Class and Subclass members' websites can be measured by available market data as well as data that is exclusively within Defendant's control.

188.   Defendant's conduct was knowing, willful, wanton and performed with deliberate or reckless indifference to Plaintiffs' and the Class's and Subclasses' property rights, warranting punitive damages in an amount to be determined at trial.

189.   In addition to the lost market value of their websites, Defendant's conduct caused and threatens to continue to cause Plaintiffs and the Class and Subclasses other harms that cannot be adequately remedied by restitution or damages, including the loss or impairment of Plaintiffs' and the Class's and Subclasses' First Amendment rights to control the presentation and content of their own websites and the prospective future lost sales, lost advertising revenues and lost goodwill that would result if Defendant continued to place competitors' ads and links to disparaging news articles on their websites.

190.   Plaintiffs and the Class and Subclasses are accordingly entitled to a permanent injunction requiring Google to forever disable the ad-generating feature of its Search App on every Android phone on which it has been installed, and preventing Google from installing any similar ad-generating code on any internet related devices or products in the future.

## THIRD CAUSE OF ACTION

(Cal. Bus. & Prof. Code §§17200, 17203)

191.   Plaintiffs incorporate by reference the allegations made in paragraphs 1 through 175 on this Class Action Complaint as if fully set forth herein.

192.   Plaintiffs assert this cause of action on behalf of themselves, the Class and the Subclasses.

193.    California Business & Professions Code § 17200 *et seq.*, known as the Unfair Competition Law ("UCL"), prohibits any unfair, unlawful or fraudulent business practice.

194.    Plaintiffs have standing to obtain an injunction under UCL §§ 17200 and 17203 because they have been injured by Google's unlawful and unfair business practices described above and may plausibly suffer future injuries if Google reinstitutes those practices in the future.

195.    Defendant violated and threatens to continue to violate the "unlawful" prong of the UCL by placing nonconsensual advertisements on Plaintiffs' and the Class's and Subclasses' websites without compensation in violation of the common law doctrines of implied-in-law contract and unjust enrichment, and by trespassing on Plaintiffs' and the Class's and Subclasses' websites in violation of the common law prohibition against trespass to chattels.

196.    Defendant's practices of obtaining nonconsensual free advertising and trespassing on Plaintiffs' and the Class and Subclass' websites violate and threatens to continue to violate the "unfair" prong of the UCL because they are immoral, unethical, oppressive, unscrupulous, unconscionable and substantially injurious to Plaintiffs and the Class and Subclass members. Defendant's conduct is contrary to publicly policy as well as the common law, and the harm it caused and threatens to continue to cause outweighs its utility, if any.

197.    As a direct and proximate result of Defendant's unlawful and unfair conduct, Plaintiffs and the Class and Subclass members were deprived of money to which they are entitled and were substantially injured in their property.

198.    Plaintiffs seek, and are entitled to, an order enjoining Defendant from committing such unlawful and unfair business practices, as well as to attorneys' fees and costs under Cal. Code Civ. Pro. § 1021.5.

## **PRAYER FOR RELIEF**

**WHEREFORE**, as a result of the foregoing, Plaintiffs, on behalf of themselves and all others similarly situated, pray for relief as follows:

1.    Declaring this to be a proper class action, certifying the proposed Class and Georgia and California Subclasses, appointing Plaintiffs as class representatives, and appointing Plaintiffs' counsel as class counsel;

1       2.      An order that Defendant is permanently enjoined from its improper conduct and

2 practices as alleged herein; specifically, an order directing Google to forever disable the ad-

3 generating feature of its Search App on every Android phone on which it has been installed, and

4 barring Google from installing any similar ad-generating code on any internet related devices or

5 products in the future;

6       3.      A judgment awarding Plaintiffs and the Class and Subclass members restitution of

7 amounts equaling the market price Google would have paid them had it purchased its banner ads in

8 the internet advertising market, together with Google's resulting unjust profits;

9       4.      A judgment awarding Plaintiffs and the Class and Subclass members actual damages

10 for the diminution in value of their websites resulting from Google's trespasses;

11       5.      A judgment awarding Plaintiffs and the Class and Subclass members exemplary

12 damages for Defendant's knowing, willful, wanton and reckless conduct;

13       6.      Pre-judgment and post-judgment interest; and

14       7.      Attorneys' fees, expenses and the costs of this action.

15                **JURY DEMAND**

16      Plaintiffs demand a trial by jury on all issues so triable.

17 Dated:  July 14, 2020            Respectfully submitted,

18 MASHIRI LAW FIRM          ALEXANDER H. SCHMIDT, ESQ.
    A Professional Corporation

19

20 By: _____     By: _____

21     Alex Asil Mashiri          Alexander H. Schmidt*
   11251 Rancho Carmel Dr., #500694  5 Professional Circle, Suite 204

22 San Diego, CA 92150        Colts Neck, New Jersey 07722
   Telephone: (858) 348-4938      Telephone: (732) 226-0004

23

24                  MASTANDO & ARTRIP, LLC
                  D. Anthony Mastando*

25                  Eric J. Artrip*
                  301 Washington St., Suite 302

26                  Huntsville, Alabama 35801
                  Telephone: (256) 532-2222

27

28         *Attorneys for Plaintiffs and the Proposed Class*

*Pro Hac Vice application to be submitted