UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| BEST CARPET VALUES, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> GOOGLE LLC, <br><br> Defendant. | Case No.  5:20-cv-04700-EJD <br><br> **ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS** <br><br> Re: Dkt. No. 19 |

Plaintiffs Best Carpet Values, Inc. and Thomas D. Rutledge (collectively "Plaintiffs") initiated this putative class action suit, asserting claims against Defendant Google LLC ("Google") for implied-in-law contract and unjust enrichment; trespass to chattels; and unfair and unlawful conduct in violation of California Business and Profession Code § 17200.  Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Google moves to dismiss the complaint without leave to amend.  Dkt. No. 19.  Plaintiffs filed an opposition (Dkt. No. 22) and Google filed a reply (Dkt. No. 28).  For the reasons discussed below, the Court will grant in part and deny in part Google's motion.

## I.     BACKGROUND[1]

Plaintiffs are owners of active U.S.-based websites.  Compl. ¶ 1.  Plaintiff Best Carpet Values, Inc. ("Best Carpet") owns bestcarpetvalue.com and Plaintiff Thomas D. Rutledge ("Rutledge") owns thomasrutledgelaw.com.  *Id.* ¶ 9.  A website is a digital document built with software and housed on a computer called a "web server."  *Id.* ¶ 34.  A webserver is owned or

---

[1] The Background is a summary of the allegations in the Complaint.

United States District Court <br> Northern District of California

controlled in part by the website's owner.  *Id*.  Commercial websites typically have a unique

"domain name" or "URL" (Uniform Resource Locator) address which enables an internet user to

find the webserver on which the website resides.  *Id*. ¶ 35.  All websites have at least one page,

called a homepage.  *Id*. ¶ 36.  Plaintiffs allege that "[b]y rights of ownership—and under the First

Amendment—website owners are entitled to control the content and information displayed on

their websites' web pages, including any advertisements, without interference."  *Id*. ¶ 51.  Once a

website is "published" and becomes "active," Internet users can reach a website by entering the

website's domain name into an internet "browser" program such as Google Chrome, Mozilla

Firefox or Microsoft Edge.  *Id*. ¶ 37.

Internet users do not necessarily need a URL to reach a website.  Internet users can find the

website by entering "search terms" into the "search bar" of an internet search engine such as

Google.com, Yahoo.com or Bing.com.  *Id*. ¶ 38.  Performing searches on search engines yields

"search results" typically in the form of a list of websites or documents that are potentially

responsive to the user's search terms.  *Id*.  When the internet user clicks on a link to a website, the

user's internet browser will connect the user to, and upload a page from, the website.  *Id*.  "The

browser does this by finding and connecting to the web server hosting the website.  The browser

then obtains a copy of the requested website page from the host web server and delivers the copy

to the user by translating the website's codes and recreating the website page on the user's

computer monitor or mobile device screen."  *Id.* ¶ 39.

Google operates several internet related businesses that provide a variety of internet related

products and services.  *Id*. ¶ 54.  Among other things, Google (1) makes and controls Android

mobile phone software, including the Android operating system, which allows users to wirelessly

access the internet; (2) owns and operates the world's most used internet browser, Google

Chrome, and the world's most-used internet search engine, google.com; and (3) owns the world's

largest internet advertising network, offering products serving every aspect of that industry,

including Google Ads (for clients advertising on Google's search results pages), AdSense

(matching buyers and sellers of display advertising on websites), and AdX (for buyers and sellers

United States District Court
Northern District of California

1    of premium, high-end website display ads).  *Id*. ¶¶ 55-58.

2         Android phone users can search the internet by either (1) opening a browser, such as

3    Chrome, by clicking the Chrome icon on one of their Android home screens; or (2) using Google's

4    Search App, which is incorporated into nearly every Android phone.  *Id*. ¶¶ 59-60.  Android users

5    searching the internet are able to retrieve virtually the same search results, whether they use

6    Search App or Chrome.  *Id*. ¶¶ 63-64.

7         Before March of 2018, the Search App icon  "  "  appeared in the suite of Google apps

8    that Google installs on Android phones, and many Android users had to click on the Search App

9    icon to use the App.  *Id*. ¶ 62.   In late March of 2018, Google updated its Search App software by

10   placing the Search App's search bar at the top of the first page of most Android home screens.  *Id*.

11   ¶¶ 65, 66.  This software update eliminated the need for Android users to click an icon before

12   conducting an internet search using Google's Search App.  *Id*. ¶ 60.  The Search App search bar

13   bears Google's "  " logo.  *Id*. ¶ 67.  Between March of 2018 and April of 2020 (the "Class

14   Period"), virtually all of the approximately 50 million Android phone users in America have used

15   the Search App's search bar to search the internet.  *Id*. ¶ 68.

16        When Android users input internet search terms in the Search App's search bar, the Search

17   App provides the user with search results, which appear on the Android user's screen as a list of

18   websites and other documents available on the internet.  *Id*. ¶ 69.  The names of the websites on

19   this search results list contain hyperlinks to those websites.  *Id*. ¶ 70.  When users click on a

20   website name, Google's search result page disappears from their screen and is replaced by the

21   website's homepage.  *Id*.

22        During the Class Period, "most websites retrieved via Search App, when activated by an

23   Android user's touching and toggling of their phone's screen, had Google's unlawful ads

24   superimposed on their homepages or other 'landing' pages.'"  *Id*. ¶ 64.  More specifically, Google

25   superimposed a leaderboard ad at the bottom of homepages that consisted of Google's logo, the

26   phrase "VIEW 15 RELATED PAGES," and a pop-up button.  *Id*. ¶¶ 73-74.  To illustrate, when a

27   Search App user clicked Best Carpet's homepage link from the search results list, the website

28   Case No.:  5:20-cv-04700-EJD
     ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

appeared as depicted in the image below on the left.  *Id.* ¶ 73.



*Id.* ¶ 73.  Once a user engaged Best Carpet's website by toggling its homepage, however, Google's Search App activated and superimposed Google's leaderboard ad on top of Best Carpet's website as depicted above in the image to the right.  *Id.*  The result was that Google's leaderboard, "VIEW 15 RELATED PAGES," covered Best Carpet's invitation to users to view its "Cove Base" products.  *Id.*  If a user were to click on the pop-up button (encircled triangle) in the leaderboard, the Search App superimposed two half-page "banner" ads that blocked 80% of what was previously viewable, and shadowed the remaining 20%.  *Id.* ¶ 74.  The two half-page banner ads were for Best Carpet's direct competitors.  *Id.* ¶ 74, 79.  Technically, the superimposed "banner" ads appeared on the copy of Best Carpet's website that was reproduced on the user's screen.  *Id.* ¶ 75.  Best Carpet considers that copy its property.  *Id.*  Each banner ad contained a link that, if clicked, redirected the users from Best Carpet's homepage to its competitor's web page.  *Id.* ¶¶ 76, 79-80.  The image below illustrates the superimposed "banner" ads.

Case No.: <u>5:20-cv-04700-EJD</u>
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

4

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12

13
14
15



16  Google's ads intruded on website owners' limited space and created distractions that undermined

17  every web page's central purpose.  *Id.* ¶ 88.  They also "compelled" business owners in nearly

18  every conceivable industry to advertise for others, including competitors.  *Id.*  ¶¶ 89, 91.  Google's

19  ad could also be misperceived by Android users as endorsements of unaffiliated businesses and

20  people.  *Id.* ¶ 91.  The Related Pages banner ads often included ads for the host website's

21  competitors (*id.* ¶ 77) and links to news stories about the host website's owner, including negative

22  news articles (*id.* ¶¶ 78, 85).

23        The purpose of the March 2018 software update was to generate profit and Google

24  succeeded in doing so.  *Id.* ¶¶ 100-148.  Google updated its Search App on or about April 22, 2020

25  to discontinue (at least temporarily) the conduct alleged in the Complaint.  *Id.* ¶ 8, n.1.  Plaintiffs

26  estimate that for those two years, Google obtained over $2 billion of non-consensual free

27  advertising.  *Id.* ¶ 146.

28  Case No.: 5:20-cv-04700-EJD
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

1    II.    **STANDARDS**

2         Federal Rule of Civil Procedure 8(a) requires a plaintiff to plead each claim with sufficient

3    specificity "to give the defendant fair notice of what the . . . claim is and the grounds upon which

4    it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations omitted).

5    A complaint which falls short of the Rule 8(a) standard may, therefore, be dismissed if it fails to

6    state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).

7         To survive a Rule 12(b)(6) motion to dismiss, the complaint "must contain sufficient

8    factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v.*

9    *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.*, 550 U.S. at  570).  A claim has facial

10   plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

11   inference that the defendant is liable for the misconduct alleged.  *Id.*  In evaluating the complaint,

12   the court must generally accept as true all "well-pleaded factual allegations."  *Id.* at 664.  The

13   court must also construe the alleged facts in the light most favorable to the plaintiff.  *See Retail*

14   *Prop. Trust v. United Bhd. Of Carpenters & Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014) (the

15   court must "draw all reasonable inferences in favor of the nonmoving party" for a Rule

16   12(b)(6) motion).  The court, however, "does not have to accept as true conclusory allegations in a

17   complaint or legal claims asserted in the form of factual allegations."  *In re Tracht Gut, LLC*, 836

18   F.3d 1146, 1150-51 (9th Cir. 2016) (citing *Bell Atl. Corp.*, 550 U.S. at 555-56).  Dismissal "is

19   proper only where there is no cognizable legal theory or an absence of sufficient facts alleged to

20   support a cognizable legal theory."  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).

21   III.    **DISCUSSION**

22        Plaintiffs assert three claims on behalf of themselves, a Class, a Georgia Subclass, and a

23   California Subclass.[2]  Each claim is addressed separately below.

24   _____

25   [2]  The "Class" is:  "All persons or entities residing in the United States that owned websites that
     were active between March 2018 and April 2020 (the 'Class Period') on which Google's logo and
26   Related Pages banner ads appeared when their websites were viewed by Android mobile phone
     owners using the Search App."  Compl. ¶ 156.

27      The "Georgia Subclass" is: "All persons or entities residing in Georgia that owned websites that

28

### A.      Trespass to Chattels Claim

Trespass to chattels lies where an intentional interference with the possession of personal property has caused injury.  *Intel Corp. v. Hamidi*, 30 Cal. 4th 1342, 1350-51 (2003); *see also Brodsky v. Apple Inc.*, 2019 U.S. Dist. LEXIS 148808, at *8 (N.D. Cal. Aug. 30, 2019).  "Dubbed by Prosser the 'little brother of conversion,' the tort of trespass to chattels allows recovery for interferences with possession of personal property 'not sufficiently important to be classed as conversion, and so to compel the defendant to pay the full value of the thing with which he has interfered.'"  *Hamidi*, 30 Cal. 4th at 1350 (quoting Prosser & Keeton, Torts (5th ed. 1984) § 14, pp. 85–86).  Under California law, "[i]n cases of interference with possession of personal property not amounting to conversion, 'the owner has a cause of action for trespass or case [sic], and may recover only the actual damages suffered by reason of the impairment of the property or the loss of its use.'"  *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1069 (N.D. Cal. 2012) (quoting *Hamidi*, 30 Cal. 4th at 1351).

Here, there are two potential chattels:  the computers hosting Plaintiffs' websites and the copies of Plaintiffs' websites appearing on users' screens.  Google contends the trespass to chattels claim fails as a matter of law as to both potential types of chattel because its Search App does not cause physical injury (*i.e.*, intrusion, interference or harm) to any tangible property.  Mot. at 6.  In making this argument, Google implicitly acknowledges that the computers hosting Plaintiffs' websites are tangible property, but contends that the Search App does not interact with those computers, much less damage them.  As for the copies of Plaintiffs' websites appearing on users' screens, Google contends that they are not tangible property, and therefore cannot be the subject of a trespass claim.

---

were active between March 2018 and April 2020 on which Google's logo and Related Pages banner ads appeared when their websites were viewed by Android mobile phone owners using the Search App."  *Id*. ¶ 157.

  The "California Subclass" is: "All persons or entities residing in California that owned websites that were active between March 2018 and April 2020 on which Google's logo and Related Pages banner ads appeared when their websites were viewed by Android mobile phone owners using the Search App."  *Id*. ¶ 158.

1    In response, Plaintiffs contend that tangible and intangible property alike can be the subject

2  of a trespass to chattels claim, and that they are alleging an injury to their intangible property,

3  namely their websites.[3]  Google allegedly injured their websites because the superimposed ads

4  impaired the website's "condition, quality, or value."  Opp'n at 18.

5    Consistent with *Kremen v. Cohen*, 337 F.3d 1024, 1029-31, 1034-35 (9th Cir. 2003), and

6  subsequently issued cases, the Court agrees with Plaintiffs that a website can be the subject of a

7  trespass to chattels claim.  In *Kremen*, the Ninth Circuit held that a registrant has property rights in

8  a domain name, and further that a domain name is intangible property[4] that is protected by

9  California conversion law.  *Id*. at 1035.  In doing so, the *Kremen* court recognized that conversion

10  was originally a remedy for the wrongful taking of another's goods, so it applied only to tangible

11  property.  *Id*. at 1030.  The *Kremen* court, however, observed that virtually every jurisdiction has

12  discarded this limitation to some degree and cited to the *Restatement* as one example of an

13  alternative test:

14    (1) Where there is conversion of a document in which intangible
      rights are merged, the damages include the value of such rights.

15

16    (2) One who effectively prevents the exercise of intangible rights of
      the kind customarily *merged in a document* is subject to a liability
      similar to that for conversion, even though the document is not itself
      converted.

17

18  *Restatement (Second) of Torts* § 242 (1965) (emphasis added).  The *Kremen* court surveyed

19  California cases, determined that California does not follow the *Restatement*'s merger requirement

20  quoted above,[5] and opined that conversion is a remedy for conversion of "every species of

21

22  _____

23  [3] None of Plaintiffs' websites, files, or data were physically altered in any way.  Nor were
    Plaintiffs' servers disrupted.

24  [4] A property right exists in a domain name because (1) it is an interest capable of precise
    definition; (2) it is capable of exclusive possession or control; and (3) registrants of the domain
25  name have a legitimate claim to exclusivity.  *Id*. at 1030.

26  [5] The *Kremen* court observed that "courts routinely apply the tort to intangibles without inquiring
    whether they are merged in a document, and, while it's often possible to dream up *some* document
27  the intangible is connected to in some fashion, it's seldom one that represents the owner's property
    interest."  *Kremen*, 337 F.3d at 1033.

28  Case No.: 5:20-cv-04700-EJD

United States District Court
Northern District of California

personal property," whether tangible or intangible. *Id*. at 1033 (quoting *Payne v. Elliot* 54 Cal. 339, 341 (1880)). Nevertheless, the *Kremen* court found it unnecessary to resolve whether or not California applies the merger requirement because Kremen's domain name had a "connection to a document or tangible object," namely the Domain Name System ("DNS")—the distributed electronic database that associates domain names with particular computers connected to the internet. *Id*. at 1033-34. The DNS was, in the Ninth Circuit's view, akin to an electronic document. *Id*. at 1034. The Ninth Circuit explained:

> We need not delve too far into the mechanics of the Internet to resolve this case. It is sufficient to observe that information correlating Kremen's domain name with a particular computer on the Internet must exist somewhere in some form in the DNS; if it did not, the database would not serve its intended purpose. Change the information in the DNS, and you change the website people see when they type "www.sex.com."

*Id*. at 1034. After *Kremen*, several courts have held that domain names are subject to conversion in California. S*ee e.g.*, *CRS Recovery, Inc. v. Laxton*, 600 F.3d 1138, 1142 (9th Cir. 2010) ("Domain names are thus subject to conversion under California law, notwithstanding the common law tort law distinction between tangible and intangible property for conversion claims."); *United States Marine Surveyors, Inc. v. Reiner*, 2016 WL 9131961, at *4 (C.D. Cal. Aug. 4, 2016) ("A website domain is property which may be converted."); *Salonclick LLC v. SuperEgo Mgmt. LLC*, 2017 WL 239379, at *4 (S.D.N.Y. Jan. 18, 2017) (holding that plaintiff had stated a claim for conversion of domain name and social media accounts under New York law).

     Plaintiffs have property rights to their websites for the same reasons a registrant has property rights to a domain name. The owner of an Internet website "has the right to establish the extent to (and the conditions under) which members of the public will be allowed access to information, services and/or applications which are available on the website." *U.S. v. Drew*, 259 F.R.D. 449, 461 (C.D. Cal. 2009) (citing *U.S. v. Phillips*, 477 F.3d 215, 219–21 (5th Cir. 2007); *EF Cultural Travel BV v.Zefer Corp.*, 318 F.3d 58, 62 (1st Cir. 2003); *Register.com, Inc. v. Verio, Inc.*, 126 F. Supp. 2d 238, 245–46 (S.D.N.Y. 2000); and *CompuServe Inc. v. Cyber Promotions*,

United States District Court
Northern District of California

United States District Court
Northern District of California

1    *Inc.*, 962 F. Supp. 1015, 1023–24 (S.D. Ohio 1997)).  Plaintiffs contend that website ownership

2    grants them a right to be paid for the advertising space occupied by Google on their websites.  And

3    like a domain name, a website is a form of intangible property that has a connection to an

4    electronic document.  "A website is a digital document built with software and housed on a

5    computer called a 'web server,' which is owned or controlled in part by the website's owner.  A

6    website occupies physical space on the web server, which can host many other documents as

7    well."  Compl. ¶ 34.  Plaintiffs' website is also connected to the DNS through its domain name,

8    bestcarpetvalue.com, just as Kremen's domain name was connected to the DNS.  Under the

9    *Kremen* court's reasoning, Plaintiffs' website has a connection to a tangible object, which satisfies

10   the *Restatement*'s merger requirement.[6]  Therefore, consistent with *Kremen*, trespass to chattels

11   ought to apply to a website, and several courts have so found.  *See YLD Ltd. v. Node Firm*, 2016

12   WL 7851414, at *2 (N.D. Cal. Aug. 17, 2016) (applying New York and federal law and denying

13   motion to dismiss claims for trespass to chattels and conversion that were based, in part, on an

14   alleged disruption to the use of a website); *Combs v. Doe*, 2011 WL 738052, at *1 (N.D. Cal. Feb.

15   23, 2011) (magistrate's report and recommendation granting default judgment on conversion claim

16   based on allegations that defendant stole website and domain names by hacking into plaintiff's

17   email); *Astroworks, Inc. v. Astroexhibit, Inc.*, 257 F. Supp. 2d 609, 618 (S.D.N.Y. 2003)

18   (sustaining claim for conversion of copyrighted website); *Ground Zero Museum Workshop v.*

19   *Wilson*, 813 F. Supp. 2d 678, 698 (D. Md. 2011) (finding allegations that defendant deprived

20   plaintiff of possession of website and damaged the chattel by inserting a redirect command

21   support a legally cognizable trespass to chattels claim); *State Analysis, Inc. v. Am. Fin. Servs.*

22   *Assoc.*, 621 F. Supp. 2d 309, 320 (E.D. Va. 2009) (sustaining trespass to chattels claim where

23

24   _____

25   [6]  After *Kremen*, the California Court of Appeal, Sixth Appellate District, noted that conversion
     traditionally required a taking of *tangible* property and that "this restriction has been greatly
     eroded," but not "destroyed."  *Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 239 n.21
26   (2010) (emphasis in original).  The *Silvaco* court also cautioned that "the expansion of conversion law
     to reach intangible property should not be permitted to 'displace other, more suitable law.'"  *Id.*  As
27   discussed above, however, Plaintiffs' websites have a connection to a tangible object.

28   Case No.: 5:20-cv-04700-EJD
     ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS
     10

United States District Court
Northern District of California

1  defendant accessed a password protect portion of plaintiff's website and thereby diminished the

2  value of plaintiff's "possessory interest in its computer network").  Google points to only one case

3  in the Ninth Circuit where the court rejected a claim for trespass to chattels involving intangible

4  property.  *See e.g.*, *GNI Waterman LLC v. A/M Valve Co. LLC*, 2007 WL 2669503, at *11 (E.D.

5  Cal. Sept. 7, 2007) (dismissing trespass to chattels claim that was based on intangible ownership

6  rights of forms, designs and patterns).  The *Waterman* case, however, is not helpful because it

7  lacks any analysis.[7]

8  　　　Having concluded that a website is a form of intangible property subject to the tort of

9  trespass to chattels, the next issue is whether Plaintiffs have alleged an injury.  *Hamidi*, 30 Cal. 4th

10  at 1348 ("the trespass to chattels tort . . . may not, in California, be proved without evidence of an

11  injury to the plaintiff's  personal property or legal interest therein").  "In modern American law

12  generally, '[t]respass remains as an occasional remedy for minor interferences, resulting in some

13  damage, but not sufficiently serious or sufficiently important to amount to the greater tort' of

14  conversion."  *Id*. at 1351 (quoting Prosser & Keeton, Torts, supra, § 15, p. 90, italics added.).

15  "Therefore, one who intentionally intermeddles with another's chattel is subject to liability only if

16  his intermeddling is harmful to the possessor's materially valuable interest in the physical

17

18  [7] In *Gary Friedrich Enters., LLC v. Marvel Enters.*, 713 F. Supp. 2d 215 (S.D.N.Y. 2010), the
court held that the claim for trespass to chattels under Illinois and New York law failed because
19  (1) defendant never assumed "physical control" over plaintiff's story idea and characters and (2)
the claim was preempted by federal copyright law.  Other cases cited by Google do not discuss the
20  distinction between tangible and intangible property and offer little guidance.  *See e.g.*, *Level 3
Commc'ns, Inc. v. Lidco Imperial Valley, Inc.*, 2012 WL 4848929, at *4 (S.D. Cal. Oct. 11, 2012)
21  (explaining that trespass to chattels requires "intentionally bringing about a physical contact with
the chattel"); *In re L.T.*, 103 Cal. App. 4th 262, 265 (2002) (explaining that for arson, "chattels"
22  are things that are "visible, tangible, movable"); *Italiani v. Metro-Goldwyn-Mayer Corp.*, 45 Cal.
App. 2d 464, 467 (1941) (explaining that trover, detinue and replevin require "interference with
23  possession of, or damage to, some specific tangible property, and are not concerned with
intangible or incorporeal rights which may exist in connection with, or entirely apart from any
24  particular piece of physical property"); *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040,
1069 (N.D. Cal. 2012) (dismissing trespass claim because although placement of data on Iphones
25  may have caused "harm" by taking up bandwidth, storage space, or shortening the battery life of a
device, plaintiffs did not plausibly establish a significant reduction in service constituting an
26  "interference with the intended functioning of the system, as by *significantly reducing* its available
memory and processing power") (citation omitted); *Angelica Textile Servs., Inc. v. Park*, 220 Cal.
27  App. 4th 495, 508 (2013) (conversion claim asserted against an employee who retained plaintiff's
documents was not displaced by California's Uniform Trade Secrets Act).

28  Case No.:  5:20-cv-04700-EJD
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

condition, quality, or value of the chattel, or if the possessor is deprived of the use of the chattel

for a substantial time, or some other legally protected interest of the possessor is affected."  *Id*.;

*see also Grace v. Apple, Inc.*, 2019 WL 3944988, at *7 (N.D. Cal. Aug. 21, 2019) (same).  In

*Hamidi*, Intel filed suit again a former employee, claiming that by communicating with employees

over the company's e-mail system, Hamidi committed trespass to chattels.  *Id*. at 1346-47.  The

California Supreme Court concluded that Intel was not entitled to summary judgment on its

trespass to chattels claim because Intel had not presented undisputed facts demonstrating that the

emails caused any "physical *or* functional harm *or* disruption" to the company's computer system.

*Id*. at 1360 (emphasis added).

Here, although Plaintiffs are not alleging physical harm to their websites, they do allege

functional harm or disruption.  Specifically, Plaintiffs allege that "[b]y obscuring and blocking the

contents of [Plaintiffs'] website homepages when viewed on Android's Search App, Google's ads

substantially interfered with and impaired the websites' published output and exposed the website

owners to unwanted risks of lost advertising revenues and lost sales to competitors, thereby

materially reducing the websites' value and utility to the website owners.  Defendant's

unauthorized interferences proximately caused Plaintiffs . . . actual damage by impairing the

condition, quality and value of their websites."  *Id*. ¶ 186.  Plaintiffs seek damages equal to the

diminished market value of their websites and a permanent injunction requiring Google to disable

the ad-generating feature of its Search App on every Android phone on which it is installed and

preventing Google from installing any similar feature in the future.  *Id*. ¶¶ 187-90.

Google argues that there is no cognizable injury because its Search App does not affect

how Plaintiffs' websites function or how they are displayed by other programs.  Mot. at 2.  Google

explains that its Search App does not alter Plaintiffs' websites at all, but rather "displays

additional content in a separate, user-controlled frame that overlays and coexists on phone screens

with Plaintiffs' sites."  Mot. at 7 (citing Compl. ¶¶ 73-74).  But at the pleading stage, Plaintiffs'

factual allegations must be taken as true.  *Ashcroft*, 556 U.S. at 678.  Plaintiffs allege that the ads

obscured and blocked their websites, which if true, would interfere with and impair their websites'

United States District Court
Northern District of California

1    published output.  Google's ad allegedly obscured the "Cove Base" product link on Best Carpet's

2    home page.  Compl. ¶ 73.  Although Google's ad may not have disabled or deactivated the "Cove

3    Base" product link, it nevertheless allegedly impaired the functionality of the website: an Android

4    phone user cannot engage a link that cannot be seen.  At the pleading stage, the alleged decrease in

5    functionality of Plaintiffs' website is sufficient to plausibly state a cognizable injury for a trespass

6    to chattels claim.  *See Compuserve Inc. v. Cyber Promotions*, 962 F. Supp. 1015, 1026 (S.D. Ohio

7    1997) (plaintiff asserting injury aside from physical impact on computer equipment stated

8    cognizable trespass to chattels claim based on decreased utility of plaintiff's e-mail service and

9    resulting customer complaints); *eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058, 1070

10   (N.D. Cal. 2000) (granting injunction based on likelihood of success on merits of trespass to

11   chattels claim based, in part, on showing that web crawlers diminished the quality or value of

12   eBay's computer system, even though eBay did not claim physical damage).

13           **B.       Implied Contract/Unjust Enrichment Claim**

14           Plaintiffs also assert a claim labeled "Implied Contract/Unjust Enrichment."  Compl. ¶¶

15   176-182.  Google contends that the Implied Contract/Unjust Enrichment claim should be

16   dismissed because it is preempted by section 301 of the Copyright Act.  Google reasons that

17   Plaintiffs' demand to be paid inevitably depends on their ability to control how copies of their

18   websites are displayed on different users' devices, and any right to control the way the websites

19   appear must be grounded in the principles of copyright law.

20           Copyright preemption applies to claims that are "asserted to prevent nothing more than the

21   reproduction, performance, distribution, or display of" the plaintiff's copyrightable property.

22   *Butler v. Target Corp.*, 323 F. Supp. 2d 1052, 1056 (C.D. Cal. 2004) (citation and internal

23   quotation  marks omitted).  Section 301 of the Copyright Act preempts a state law claim when two

24   conditions are satisfied:  (1) the work involved falls within the general subject matter of the

25   Copyright Act as specified by sections 102 and 103; and (2) the rights that the plaintiff asserts

26   under state law are equivalent to those protected by the Act in section 106 in works of authorship

27   that are fixed in a tangible medium of expression.  *Kodadek v. MTV Networks, Inc.*, 152 F.3d

28   Case No.: 5:20-cv-04700-EJD
     ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

United States District Court
Northern District of California

1209, 1213 (9th Cir. 1998).  Here, the first condition is satisfied because websites and the manner in which they are displayed fall within the subject matter of copyright.  *See Ticketmaster LLC v. Prestige Entm't W., Inc.*, 315 F. Supp. 3d 1147, 1160-61 (C.D. Cal. 2018) ("the typical commercial website readily qualifies for copyright protection."); *Bangkok Broad. & TV Co. v. IPTV Corp.*, 742 F. Supp. 2d 1101, 1110 (C.D. Cal. 2010) (copyright protects website owners' "exclusive rights to copy, distribute or display the copyrighted work publicly").

Plaintiffs rely on *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1004 (9th Cir. 2001), which sets forth a slightly different formulation of the test for preemption.  Plaintiffs argue that Google's ads (and not the websites) are the subject matter of their claim, and because they do not assert any copyright in Google's ads, their claim is not preempted.  In *Downey*, the Ninth Circuit stated that the two conditions that must be satisfied for copyright preemption are:  (1) "the content of the protected right must fall within the subject matter of copyright" and (2) "the right asserted under state law must be equivalent to the exclusive rights contained in section 106 of the Copyright Act."  *Id*.  The plaintiffs in *Downing* brought suit against defendant because it published a photograph of them without their authorization.  The Ninth Circuit held that the first condition was not satisfied because "the subject matter of [plaintiffs'] statutory and common law right of publicity claims [was] their names and likenesses," which were not copyrightable, even though their names and likeness were embodied in a copyrightable photograph.  *Id*. at 1005.  Here, the "subject matter" of  Plaintiffs' claim necessarily concerns both Plaintiffs' websites and the advertisements.  Plaintiffs allege that it is the placement of the ads "on top" of their websites that give rise to their right to damages.  Compl. ¶¶ 17, 73.   As stated previously, websites fall within the subject matter of copyright.  Therefore, the first part of the preemption test is satisfied.

Turning to the second condition, the Second Circuit has instructed that section 301 preemption "only applies to those state law rights that 'may be abridged by an act which, in and of itself, would infringe one of the exclusive rights' provided by federal copyright law.'"  *Comput. Assocs. Int'l, Inc v. Altai, Inc.*, 982 F.2d 693, 716 (2d Cir. 1992) (citing *Harper & Row, Publishers, Inc. v. Nation Enters.*, 723 F.2d 195, 200 (2d Cir. 1983), *rev'd on other grounds*, 471

United States District Court
Northern District of California

U.S. 539 (1985)).  In other words, copyright preemption applies to claims that are "asserted to prevent nothing more than the reproduction, performance, distribution, or display of" a plaintiff's copyrightable property.  *Butler v. Target Corp.*, 323 F. Supp. 2d 1052, 1056 (C.D. Cal. 2004) (citation and internal quotation marks omitted).  If the state law claim requires an extra element "instead of or in addition to the acts of reproduction, performance, distribution or display . . . , then the right does not lie 'within the general scope of copyright' and there is no preemption." *Nat'l Car Rental Sys. v. Comput. Assocs. Int'l*, 991 F.2d 426, 431 (8th Cir. 1993) (quoting 1 Nimmer on Copyright § 1.01[B], at 1-13)).  To avoid preemption, the state law claim must include "an 'extra element' that makes the right asserted *qualitatively different* from those protected under the Copyright Act" and "must effectively change the nature of the action so that it is qualitatively different from a copyright infringement claim."  *Media.net Advert.FZ-LLC v. NetSeer, Inc.*, 156 F. Supp. 3d 1052, 1069-70 (N.D. Cal. 2016) (state law claims predicated on alleged copying of "source code, design and look and feel" of search results page were preempted).

Here, Plaintiffs are not asserting infringement of any right to the reproduction, performance, distribution, or display of their websites.[8]  Plaintiffs want and expect Google to copy and display their websites in Chrome browser and Search App, and acknowledge that Google has license to do so.  Opp'n at 6.  Rather, Plaintiffs' implied-in-law contract/unjust enrichment claim is a state claim with extra elements "instead of or in addition to" the acts giving rise to a copyright infringement claim.  *Nat'l Car Rental Sys.*, 991 F.2d at 431.  An implied-in-law contract claim "is a common law obligation implied by law based on the equities of a particular case."  *Fed. Deposit Ins. Corp. v. Dintino*, 167 Cal. App. 4th 333, 346-47 (2008); *see also Parino v. Bidrack, Inc.*, 838 F. Supp. 2d 900, 908 (N.D. Cal. 2011) ("a claim for unjust enrichment/restitution is properly pled as a claim for a contract implied-in-law").  A party may be required to make restitution under an

---

[8] As such, this case is distinguishable from the cases cited by Google in which the plaintiff asserted claims of copyright infringement.  *See 1-800 Contacts, Inc. v. WhenU.com*, 309 F. Supp. 2d 467, 479 (S.D.N.Y. 2003); *Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp. 2d 734, 738 (E.D. Mich. 2003); and *U-Haul Int'l, Inc. v. WhenU.com, Inc.*, 279 F. Supp. 2d 723, 724 (E.D. Va. 2003) (rejecting copyright infringement claim, but dismissing unjust enrichment claim without prejudice).

1   implied-in-law contract if that party is unjustly enriched at the expense of another.  *Id*. at 346.

2   "Unjust enrichment claims are not categorically preempted by the Copyright Act."  *Martin v. Walt*

3   *Disney Internet Grp.*, 2010 WL 2634695, at *7 (S.D. Cal. 2010).

4          Plaintiffs allege that Google "unjustly enriched itself by saving substantial advertising

5   costs and earning undue profits at Plaintiffs' expense . . ., and it did so through the coercive act of

6   superimposing advertisements on their websites' homepages and other landing pages without

7   obtaining their consent or paying them compensation."  Compl. ¶ 178.  Plaintiffs allege that this

8   unjust enrichment "gives rise to an implied-in-law obligation and contract with Plaintiffs . . .

9   requiring Defendant (i) to restore them to their original positions by making restitution to them

10  equal to the full value of the cost savings benefits that Defendant unjustly obtained, and (ii) to

11  disgorge and pay to them Defendant's undue profits gained from its ads."  *Id*.  Plaintiffs do not

12  rely on copyright protection for their websites in pleading their claim; Plaintiffs do not allege that

13  Google "improperly benefited from using a certain work."  *Firoozye v. Earthlink Network*, 153 F.

14  Supp. 2d 1115, 1123-24 (N.D. Cal. 2001).[9]  Instead, Google allegedly covered up or obscured a

15  portion of Plaintiffs' websites from Android phone users for financial benefit, which makes their

16  claim "qualitatively different" from a copyright claim.

17         Indeed, the content of Plaintiffs' websites and whether that content enjoys copyright

18  protection are irrelevant to Plaintiffs' claim.  Plaintiffs analogize their claim to that of a store

19  owner, asserting:

20         Google could not in the brick-and-mortar marketplace lawfully plant
           its logo on Plaintiffs' storefront windows without Plaintiffs' consent,
21         even if Google owned their buildings.  Nor could Google place ads in

22

23  [9]  As such, this suit is distinguishable from cases relied on by Google.  *See Identity Arts v. Best
    Buy Enter. Servs., Inc.*, 2007 WL 1149155, at *20 (N.D. Cal. Apr. 18, 2007) (preemption applied
24  to unjust enrichment claim that was based on wrongful creation and use of derivative works of a
    movie trailer); *Design Data Corp. v. Unigate Enter.*, 2013 WL360542, at *7  (N.D. Cal. Jan. 29,
25  2013) (preemption applied to implied contract claim that was based on unauthorized use of
    copyrighted structural steel detailing software); *Santos v. Telmundo Commc'ns Grp. LLC*, 2012
26  WL 9503003, at *8 (C.D. Cal. Dec. 19, 2012) (unjust enrichment claim based on same facts and
    same rights as copyright claim, i.e. alleged broadcasting of songs without permission, was
27  preempted).

28  Case No.:  5:20-cv-04700-EJD
    ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS
                                              16

1
2
3
4

> Plaintiffs' marketing brochures or superimpose ads on top of Plaintiffs' print advertisements without Plaintiffs' permission and without paying Plaintiffs' price. Likewise, Google cannot in the online marketplace unilaterally superimpose ads on Plaintiffs' website without Plaintiffs' consent and without compensation just because Google makes the software through which Android users view that website on their mobile screens.

5  Compl. ¶ 17.  According to Plaintiffs, a storefront business owner is injured when its window is

6  obscured, regardless of whether that window is clear or covered with advertisements.  By analogy,

7  a website owner is injured when its website is obscured by unwanted ads, regardless of the content

8  displayed in the website.

9      From Google's perspective, the subject matter of Plaintiffs' websites is surely significant.

10  The leaderboard pop-up button Google superimposed on the Best Carpet website homepage led to

11  ads for alternative products of potential interest to the Android phone user:  "Commercial Carpet

12  Tiles" and "Commercial Carpet Tiles & Resilient Flooring."  Compl. ¶ 74.  Google no doubt

13  placed carpet ads on Best Carpet's website to lure business and make profit.  But from Plaintiffs'

14  perspective, the content of their websites is not germane to their claims.  What matters for

15  purposes of Plaintiffs' claim is that their websites are potential revenue-generating advertising

16  space, and not that they display copyrightable content.

17      Under Plaintiffs' theory, a Google ad obscuring a website with trivial or no content at all

18  could support a claim for implied contract/unjust enrichment.  Hypothetically, a website could

19  consist of nothing more than a single line of noncopyrightable text such as "Pat and Jo's

20  Wedding."[10]  If this hypothetical noncopyrightable website was overlaid with ads for wedding

21  attire and tableware, an argument could be made that the advertiser was unjustly enriched at the

22  expense of the wedding planners.  "California law recognizes a right to disgorgement of profits

23  resulting from unjust enrichment, even where an individual has not suffered a corresponding loss."

24  *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 599 (9th Cir. 2020).  Plaintiffs' claim

25

26  [10] Copyrights extend to "original works of authorship fixed in any tangible medium of

27  expression," such as literary, musical, graphic, architectural works and sound recordings. 17 U.S.C. § 102(a).

28  Case No.: 5:20-cv-04700-EJD
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

United States District Court
Northern District of California

to recover advertising fees is not preempted.  *See In re De Laurentiis Entm't Grp., Inc.*, 963 F.2d 1269, 1271-72 (9th Cir. 1992) (copyright preemption not implicated as defense against implied-in-law contract claim to recover "the reasonable value of the advertising [plaintiff] had provided for [defendant's] benefit and for which it had not been paid").

### C.    Section 17200 Claim

Plaintiffs allege the Android Search App violates Section 17200 of California's Unfair Competition Law ("UCL"), which prohibits business practices that are "unlawful, unfair, or fraudulent." Cal. Bus & Prof Code § 17200.  Plaintiffs bring their claim under only the first two prongs: unlawful and unfair.  Compl. ¶ 194.  As to the unlawful business practices prong, Plaintiffs allege that "Defendant plac[ed] nonconsensual advertisements on Plaintiffs' . . . websites without compensation in violation of the common law doctrines of implied-in-law contract and unjust enrichment, and by trespassing on Plaintiffs' . . . websites in violation of the common law prohibition against trespass to chattels." Compl. ¶ 195.  As to the unfair business practices prong, Plaintiffs allege that Google's  conduct is "immoral, unethical, oppressive, unscrupulous, unconscionable and substantially injurious to Plaintiffs." *Id*. ¶ 196.  Plaintiffs also allege that Google's conduct is contrary to public policy as well as the common law, and the harm it caused (and threatens to continue to cause) outweighs its utility, if any. *Id*.

#### 1.    Unlawful Prong

The unlawful prong of the UCL prohibits "anything that can properly be called a business practice and that at the same time is forbidden by law." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163, 180 (1999) (quotation markets and citations omitted).  Plaintiffs' UCL claim, as pled under the unlawful prong, survives because the trespass to chattels and the breach of implied contract/unjust enrichment may serve as the predicate for the claim.

#### 2.    Unfair Prong

There are two standards for determining what "unfair competition" is under the UCL, and the parties disagree on the applicable standard.  Defendants argue that Plaintiffs' claim is essentially one "between competitors," and therefore the applicable standard is whether the

Case No.: 5:20-cv-04700-EJD
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS
18

United States District Court
Northern District of California

1    conduct complained of threatens "an incipient violation of an antitrust law, or violates the policy

2    or spirit of one of those laws because its effects are comparable to or the same as a violation of the

3    law, or otherwise significantly threatens or harms competition." *Cel-Tech*, 20 Cal.4th at 187.

4    Plaintiffs rely on the second standard, which is applicable to claims brought by a consumer and

5    "involves balancing the harm to the consumer against the utility of the defendant's practice."

6    *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 735 (9th Cir. 2007).  Plaintiffs characterize

7    themselves as "consumers of Google's services giving the public access to their websites (which

8    they did not have to pay for because the service is free)."  Opp'n at 19.

9        Google has the better argument.  Plaintiffs are not consumers of the product that has

10   caused the alleged injury, the Google Search App.[11]  In the context of this case, the consumers are

11   Android phone users who search the Internet for content.  Therefore, the *Cel-Tech* standard

12   applies.  Because Plaintiffs effectively concede they cannot meet the *Cel-Tech* standard, the UCL

13   claim, as pled under the unfair prong, is dismissed.

### D.    First Amendment Defense

15       Finally, Google argues that the First Amendment prohibits Plaintiffs' attempts to control

16   what information is displayed to users when they access Plaintiffs' websites.  Mot. at 12.  In

17   response, Plaintiffs contend that their First Amendment rights as website publishers are paramount

18   and that Google has no right to force its own messages onto Plaintiffs' websites.

19       The First Amendment states that "Congress shall make no law respecting an establishment

20   of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the

21   press."  U.S. Const. amend. I.  "[T]he First Amendment guarantees 'freedom of speech,' a term

22   necessarily comprising the decision of both what to say and what not to say."  *Riley v. Nat'l Fed'n*

23   *of the Blind of N.C., Inc.*, 487 U.S. 781, 796–97 (1988).  The Free Speech Clause of the First

24   Amendment "can serve as a defense in state tort suits."  *Snyder v. Phelps*, 562 U.S. 443, 451

25

26   [11] California's Consumer Legal Remedies Act defines a consumer as "an individual who seeks or
     acquires, by purchase or lease, any goods or services for personal, family, or household purposes."
27   Cal. Civ. Code § 1761; *see also* Cal. Civ. Code § 1791 ("consumer goods" are products "used,
     bought, or leased for use primarily for personal, family, or household purposes").

28   Case No.: 5:20-cv-04700-EJD
     ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

United States District Court
Northern District of California

(2011) (citing *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50–51 (1988)).  In the context of the Internet, courts have recognized that search-engine results may constitute speech protected by the First Amendment.  *See E-Ventures Worldwide, LLC v. Google, Inc.*, 188 F. Supp. 3d, 1265, 1274 (2016) (search engine output results are protected by the First Amendment); *Zhang v. Baidu.Com, Inc.*, 10 F. Supp. 3d 433, 439 (S.D.N.Y. 2014) ("When search engines select and arrange others' materials, and add the all-important ordering that causes some materials to be displayed first and others last, they are engaging in fully protected First Amendment expression."); *Search King, Inc. v. Google Tech., Inc.*, 2003 WL 21464568, at *4 (W.D. Okla. May 27, 2003) (Google's PageRank system was "entitled to full constitutional protection").  Thus, a company such as Google cannot be compelled to place ads in "prominent places" on its search engine results.  *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 629 (D. Del. 2007) ("Defendants are correct in their position that the injunctive relief sought by Plaintiff contravenes Defendants' First Amendment rights.").

Here,  Plaintiffs are not challenging Google's search engine results.  Rather, Plaintiffs complain that after users see Google's search results and then choose to link to their proprietary websites, the users see unpaid-for Google ads on their webpages that entice and redirect those users to Best Carpet's competitors' or naysayers' websites in order to generate profits for Google. Compl. ¶¶ 71-88.  Therefore, the cases cited above are inapposite.

Furthermore, the First Amendment defense is not absolute.  *Downing*, 265 F.3d at 1001. For example, the First Amendment does not immunize deceptive advertising.  *Id*. at 1002 (holding that defendant's commercial use of photographs to promote clothing "does not contribute significantly to a matter of the public interest and that Abercrombie cannot avail itself of the First Amendment").  Here, Plaintiffs allege that Google's leaderboard and banner ads are commercial speech that misleadingly imply that they endorse Google's ads or were compensated by Google for placing the ads.  Compl. ¶¶ 75, 85.  Therefore, if Plaintiffs prevail in this suit, Google can be enjoined from tethering similar ads to Plaintiffs' websites in the future.  *See Zauderer v. Office of Disciplinary Counsel of Supreme Court*, 471 U.S. 626, 637-38 (1985) (advertising is a form of commercial speech and can be enjoined if false, deceptive or misleading); *Compuserve Inc. v.*

United States District Court
Northern District of California

*Cyber Promotions*, 962 F. Supp. 1015, 1026 (S.D. Ohio 1997) (holding that the First Amendment provides no defense for intentional bulk emailing to plaintiff's subscribers).

Relatedly, Google argues that Android users' have a "right to hear"—the right to receive information—that is "no less protected by the First Amendment than [Google's] right to speak. *Conant v. Walters*, 309 F.3d 629, 643 (9th Cir. 2002).  However, this right is "a necessary predicate to the *recipient's* meaningful exercise of his own rights of speech, press, and political freedom." *Bd. of Educ., Island Tress Union Free School Dist. v. Pico*, 457 U.S. 853, 867 (1982). Here, it is the Android users who are the recipients of the advertising, not Google.  The "right to hear" does not provide Google a defense against Plaintiffs' claims.[12]

## IV.    CONCLUSION

For the reasons stated above, Google's motion to dismiss is GRANTED as to the UCL claim under the unfair prong and DENIED in all other respects.  The UCL claim under the unfair prong is dismissed without leave to amend.

**IT IS SO ORDERED.**

Dated:  September 24, 2021

_____
EDWARD J. DAVILA
United States District Judge

---

[12] The other cases relied upon by Google are inapplicable here.  *See Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (holding that First and Fourteenth Amendments prohibit making private possession of obscene material a crime); *Citizens United v. FEC*, 558 U.S. 310, 339 (2010) (federal statute barring independent corporate expenditures for electioneering communications violated First Amendment).

Case No.: 5:20-cv-04700-EJD
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

United States District Court
Northern District of California